NO. 20-35507

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant*,

v.

MYRON "MIKE" KREIDLER, in his official capacity as Insurance Commissioner for the State of Washington; JAY ROBERT INSLEE, in his official capacity as Governor of the State of Washington,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Washington at Tacoma
No. 3:19-cv-05181-BHS
The Honorable Benjamin H. Settle

---

## DEFENDANTS-APPELLEES' ANSWERING BRIEF

---

ROBERT W. FERGUSON
Attorney General

PAUL M. CRISALLI, WSBA #40681
JEFFREY T. SPRUNG, WSBA #23607
MARTA DELEON, WSBA #35779
JOYCE A. ROPER, WSBA #11322
Assistant Attorneys General

800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744
Paul.Crisalli@atg.wa.gov
Jeff.Sprung@atg.wa.gov
Marta.DeLeon@atg.wa.gov
Joyce.Roper@atg.wa.gov
*Attorneys for Defendants-Appellees*

# TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................1

II.   JURISDICTIONAL STATEMENT ...................................2

III.  ISSUES ...........................................................................3

       1.  Did the district court correctly rule that Cedar Park did not establish injury in fact, where Washington's conscience objection statute allows employers to refuse to purchase services to which they object, including services set forth in the Reproductive Parity Act?............................................3

       2.  Did the district court correctly dismiss Cedar Park's narrow equal protection claim, where Washington's conscience objection statute does not treat differently religious employers and religious providers, carriers, and facilities because of religion? ...............................................................3

       3.  In the alternative, did Cedar Park fail to allege sufficient facts to state its claims?.........................................................3

IV.  STATEMENT OF THE CASE ........................................3

     A.  Washington Law Allows Individuals and Organizations to Refuse to Purchase Health Care Coverage to Which They Have a Moral or Religious Objection .........................................3

     B.  Two Opinions by the Washington State Attorney General Explain How Employers and Insurance Carriers Can Implement the Conscience Objection Statute .............................5

     C.  Washington Enacts a Law Requiring Health Plans to Cover Contraception and to Include Abortion Care if They Include Maternity Care Without Modifying the Conscience Laws .........7

D.  After Allowing Multiple Amended Complaints and
    Accepting Multiple Rounds of Briefing, the District Court
    Dismissed Cedar Park's Suit for Lack of Standing...................10

V.  SUMMARY OF THE ARGUMENT ..............................................15

VI.  STANDARD OF REVIEW ...............................................................16

VII.  ARGUMENT ...................................................................................18

A.  Cedar Park Did Not Suffer an Injury-in-Fact, So Its
    Claims Are Not Justiciable........................................................18

    1.  Cedar Park failed to show that it cannot purchase a
        health plan consistent with its beliefs because of the
        State Officials' actions or inactions .....................................19

    2.  The district court properly considered the Insurance
        Commissioner's press release .............................................23

    3.  *Skyline* is not on point .........................................................25

B.  The District Court Correctly Dismissed the Equal Protection
    Claim .......................................................................................29

C.  Even if Cedar Park's Claims Were Justiciable, It Fails to
    State a Claim..............................................................................35

    1.  Cedar Park fails to allege a cognizable free exercise claim.36

        a.  The text and operation of SB 6219 are neutral..............37

        b.  SB 6219 is generally applicable .....................................40

        c.  SB 6219 is rationally related to a legitimate
            governmental purpose....................................................43

    2.  Cedar Park failed to allege a cognizable establishment
        clause claim........................................................................45

3. Cedar Park failed to allege a cognizable "religious
autonomy" claim ..................................................................48

VIII. CONCLUSION ....................................................................49

# TABLE OF AUTHORITIES

## Cases

*Am. Bankers Ass'n v. Gould*,
  412 F.3d 108 (9th Cir. 2005) ......................................................... 44

*Am. Family Ass'n, Inc. v. City & County of San Francisco*,
  277 F.3d 1114 (9th Cir. 2002) ................................................. 46, 47

*Arizona Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ....................................................... 30

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................... 17, 38

*Baker v. Teachers Ins. & Annuities Ass'n*,
  588 P.2d 1164 (Wash. 1979) .......................................................... 41

*Barren v. Harrington*,
  152 F.3d 1193 (9th Cir. 1998) ....................................................... 29

*Bassett v. ABM Parking Servs., Inc.*,
  883 F.3d 776 (9th Cir. 2018) ................................................... 19, 34

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................... 17, 39

*Bollard v. Cal. Province of Soc'y of Jesus*,
  211 F.3d 1331 (9th Cir. 2000) ....................................................... 48

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ................................................................... 28

*Catholic League for Religious & Civil Rights v. City & County of San Francisco*,
  624 F.3d 1043 (9th Cir. 2010) (en banc) ....................................... 46

*Cetacean Cmty. v. Bush*, 386 F.3d 1169 (9th Cir. 2004) ................................. 16

iv

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
    598 F.3d 1115 (9th Cir. 2010) ........................................................ 16

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ................................................... 36, 37, 38, 40

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ....................................................................... 29

*Clapper v. Amnesty Int'l USA*,
    586 U.S. 398 (2013) ....................................................................... 34

*Conservation Force v. Salazar*,
    646 F.3d 1240 (9th Cir. 2011) ........................................................ 17

*Daniels-Hall v. Nat'l Educ. Ass'n*,
    629 F.3d 992 (9th Cir. 2010)..................................................... 17, 34

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872, 878–79 (1990) ......................................................... 36

*Five Corners Family Farmers v. State of Washington*,
    268 P.3d 892, (Wash. 2011) ............................................................ 5

*Foti v. City of Menlo Park*,
    146 F.3d 629 (9th Cir. 1998)........................................................... 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ....................................................................... 19

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.*,
    465 F.3d 1123 (9th Cir. 2006)......................................................... 35

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ....................................................................... 45

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012) ....................................................................... 48

*Hoye v. City of Oakland,*
    653 F.3d 835 (9th Cir. 2011) ........................................................... 18

*In re Century Aluminum Co. Sec. Litig.,*
    729 F.3d 1104 (9th Cir. 2013) ......................................................... 39

*In re First T.D. & Inv., Inc.,*
    253 F.3d 520 (9th Cir. 2001) ........................................................... 44

*Jones v. Wolf,*
    443 U.S. 595 (1979) ........................................................................ 48

*Kreisner v. City of San Diego,*
    1 F.3d 775 (9th Cir. 1993) ............................................................... 37

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ........................................................................ 46

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................ 21

*McCreary County v. Am. Civil Liberties Union of Ky.,*
    545 U.S. 844 (2005) ........................................................................ 23

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir. 1999) ......................................................... 36

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ................................................................... 48

*Pers. Adm'r of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ........................................................................ 30

*Quadrant Corp. v. State Growth Mgmt. Hearings Bd.,*
    110 P.3d 1132 (Wash. 2005) ........................................................... 44

*Rattlesnake Coal. v. E.P.A.,*
    509 F.3d 1095 (9th Cir. 2007) ......................................................... 16

*Reynolds v. United States*,
   98 U.S. 145 (1878) .................................................................................... 37

*Rosales v. United States*,
   824 F.2d 799, (9th Cir. 1987) .................................................................. 25

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ............................................................ 24, 25

*Safe Air for Everyone*,
   373 F.3d at 1039 ....................................................................................... 25

*San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*,
   905 F. Supp. 2d 1158 (E.D. Cal. 2012) ..................................................... 25

*Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa County*,
   343 F.3d 1036 n.2 (9th Cir. 2003) ............................................................ 16

*Simon v. E. Kentucky Welfare Rights Org.*,
   426 U.S. 26 (1976) .............................................................................. 21, 22

*Skyline Wesleyan Church v. California Dep't of Managed Health Care*,
   968 F.3d 738 (9th Cir. 2020) ................................................. 25, 26, 27, 28

*Stormans, Inc. v. Wiesman*,
   794 F.3d 1064 (9th Cir. 2015) ........................................................... passim

*Telesaurus VPC, LLC v. Power*,
   623 F.3d 998 (9th Cir. 2010) ................................................................... 17

*Thornton v. City of St. Helens*,
   425 F.3d 1158 (9th Cir. 2005) ................................................................. 30

*Vernon v. City of Los Angeles*,
   27 F.3d 1385 (9th Cir. 1994) ................................................................... 46

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................................................. 29

*Washington v. Davis*,
  426 U.S. 229 (1976) ....................................................................... 29

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ................................................... 23, 24

## Statutes

2018 Wash. Sess. Laws, ch. 119 § 1 ................................................ 8, 39, 43, 46

28 U.S.C. § 1291 .............................................................................. 2

SB 6219 ..................................................................................... passim

Wash. Admin. Code § 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 .......................................... 4, 33

Wash. Admin. Code § 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 ................................................ 10

Wash. Rev. Code § 48.43 ........................................................... 41, 42

Wash. Rev. Code § 48.43.065 ................................................... passim

Wash. Rev. Code § 48.43.072 .......................................... 1, 7, 8, 38

Wash. Rev. Code § 48.43.073 .......................................... 1, 7, 9, 38

## Rules

Fed. R. Civ. P. 12(b)(1) ......................................................... 16, 23, 24

Fed. R. Civ. P. 12(b)(6) .............................................................. 16, 17

## **Other Authorities**

Comm. on Adolescent Health Care Long-Acting Reversible Contraception
    Work Grp., Am. Coll. of Obstetricians & Gynecologists, "Committee
    opinion no. 539: adolescents and long-acting reversible contraception:
    implants and intrauterine devices," Obstetrics & Gynecology Vol. 120,
    issue 4, at 983–88 (Oct. 2012)........................................................... 10

Wash. Op. Att'y Gen. 10 (2006)............................................... 6, 7, 26

Wash. Op. Att'y Gen. 5 (2002)................................................. 5, 6, 26

# I. INTRODUCTION

To further its policy objectives of improving the health, safety, and economic well-being of its citizens, Washington enacted the Reproductive Parity Act, Wash. Rev. Code §§ 48.43.072, .073, which requires insurance carriers to provide coverage for contraceptives and, if the plan includes maternity coverage, to provide equivalent abortion coverage. But in enacting the law, Washington also recognized that this policy choice was balanced against the fact that some employers may disagree with such coverage by reason of religion or conscience, so Washington's conscience objection statute allows employers to refuse to purchase coverage of services to which they object.

After providing multiple opportunities to amend and supplement its complaint, Cedar Park Assembly of God (Cedar Park) still failed to establish that it had standing to challenge the Reproductive Parity Act, since it can refuse to purchase coverage for services to which it objects. As Cedar Park admits, Washington's Insurance Commissioner previously has approved a carrier's insurance plan that excludes coverage for services to which the carrier (and Cedar Park) object, undermining any assertion that Washington officials caused its alleged injury.

In short, the Governor and Insurance Commissioner are not the cause of Cedar Park's failure to obtain an insurance plan that excludes coverage for services to which it objects. Rather, the cause of any such failure is either Cedar Park's own business decisions or the independent business decisions of insurance carriers about what plans to offer in the market.

Nor does Washington's conscience objection statute treat religious employers like Cedar Park differently because of their religion as compared to religious insurance carriers, health care providers, and health care facilities. Instead, the statute differentiates between employers and carriers, providers, and facilities based on their distinct roles in the marketplace.

The district court thus correctly dismissed Cedar Park's claims for failure to establish an injury-in-fact traceable to the State Officials' conduct. This Court should affirm.

## II. JURISDICTIONAL STATEMENT

Appellees—Insurance Commissioner Mike Kreidler and Governor Jay Inslee (State Officials)—agree that this Court has jurisdiction under 28 U.S.C. § 1291. For the reasons set forth by the district court and this brief, the district court correctly dismissed Cedar Park's claims for lack of jurisdiction.

2

## III.    ISSUES

1.    Did the district court correctly rule that Cedar Park did not establish injury in fact, where Washington's conscience objection statute allows employers to refuse to purchase services to which they object, including services set forth in the Reproductive Parity Act?

2.    Did the district court correctly dismiss Cedar Park's narrow equal protection claim, where Washington's conscience objection statute does not treat differently religious employers and religious providers, carriers, and facilities because of religion?

3.    In the alternative, did Cedar Park fail to allege sufficient facts to state its claims?

## IV.    STATEMENT OF THE CASE

### A.    Washington Law Allows Individuals and Organizations to Refuse to Purchase Health Care Coverage to Which They Have a Moral or Religious Objection

Since at least 1995, Washington has recognized the need to strike a balance in health insurance to preserve the individual right to free exercise of religion while ensuring that enrollees receive the full range of services covered under their health plans. Wash. Rev. Code § 48.43.065. The Legislature "recognizes that every individual possesses a fundamental right to exercise their religious beliefs and conscience" and "that in developing public policy, conflicting religious and moral beliefs must be respected." Wash. Rev. Code § 48.43.065(1).

3

To that end, the Legislature provided that no one with a religious belief opposed to particular health care service must purchase coverage for that service:

> No individual or organization with a religious or moral tenet opposed to a specific service may be required to purchase coverage for that service or services if they object to doing so for reason of conscience or religion.

Wash. Rev. Code § 48.43.065(3)(a). The Legislature also ensured that enrollees could not be denied access to coverage as a result of someone else's refusal to purchase coverage for such services because of conscience or religious belief:

> The provisions of this section shall not result in an enrollee being denied coverage of, and timely access to, any service or services excluded from their benefits package as a result of their employer's or another individual's exercise of the conscience clause in (a) of this subsection.

Wash. Rev. Code § 48.43.065(3)(b). The Legislature directed the Insurance Commissioner to adopt rules establishing a process where health carriers can offer the required basic health plan services to individuals and organizations to implement this statute. Wash. Rev. Code § 48.43.065(3)(c). The Insurance Commissioner thus adopted a rule that protects the conscience rights of health insurance purchasers. Wash. Admin. Code § 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.

**B.**   **Two Opinions by the Washington State Attorney General Explain How Employers and Insurance Carriers Can Implement the Conscience Objection Statute**

Washington State's Attorney General has issued formal opinions analyzing the conscience objection statute.[1] In a 2002 opinion, the Attorney General addressed (1) whether a carrier can charge enrollees for the costs caused when an employer objects to coverage of services because of a conscience objection; and (2) whether a carrier can include the cost of objectionable services in the actuarial analysis of the carrier's rates (such as an administrative, overhead, contingency, or other expense or allowance) where employers do not directly purchase those services. Wash. Op. Att'y Gen. 5 (2002). The opinion concludes that it would be an unfair practice for a carrier to provide a generally comprehensive prescription drug plan that excludes prescription contraceptives. *Id.* The opinion makes clear, however, that it was not addressing any options carriers could use to absorb the costs when objecting employers purchase coverage. *Id.*

---

[1] Formal attorney general opinions "are generally 'entitled to great weight'" in Washington courts. *Five Corners Family Farmers v. State of Washington*, 268 P.3d 892, 899 (Wash. 2011) (quoting *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 920 P.2d 581, 588 (Wash. 1996)).

On the second question, the opinion explains that subsection four of the conscience statute, which provides that the statutes do not require carriers, facilities, or providers to provide health care services without appropriate payment of premium or fee, "reflect[s] the overall principle that the provision of these services should be in accordance with recognized insurance principles." *Id.* Subsection four does not impose "any additional restrictions over and above the insurance principles that govern premiums and rates." *Id.* A carrier can include the costs of the objected-to service as a component in the actuarial analysis of the carrier's rates, so long as it does not require the employer to directly purchase the objectionable health service, the enrollee is not denied coverage or access to the service, the enrollee does not have to make additional payments, and the carriers provides the service with appropriate payment of premium or fee. *Id.* The opinion would "not attempt to analyze the details of particular concepts or proposals." *Id.*

A 2006 AGO opinion provided additional clarification that the 2002 opinion addressed how carriers dealt with the conscience objection. Wash. Op. Att'y Gen. 10 (2006). The 2006 opinion explained that the 2002 opinion "concluded that it would be an unfair practice for the *carrier to charge the employers to recoup the additional cost of including contraceptive coverage.*"

*Id.* (emphasis in original). The 2002 opinion "did not directly conclude that the employers would violate the law by declining to pay for contraceptives for their employees." *Id.* And the 2006 opinion reiterated that there may be other lawful ways for employers to exercise their conscience clause rights, but an AGO opinion "is not an appropriate vehicle to examine how that might be done as a matter of employment and insurance practices, or whether there would be legal pitfalls in any approach." *Id.*

**C.     Washington Enacts a Law Requiring Health Plans to Cover Contraception and to Include Abortion Care if They Include Maternity Care Without Modifying the Conscience Laws**

Against that backdrop, in 2018, the Legislature passed, and the Governor signed, Senate Bill (SB) 6219 (codified as Wash. Rev. Code §§ 48.43.072, .073), which requires that health plans provide contraceptive coverage and that a health plan providing coverage for maternity care or services also include coverage for equivalent abortion services. The Legislature found that access to a full range of health benefits and preventative services "provides all Washingtonians with the opportunity to lead healthier and more productive lives;" that "neither a woman's income level nor her type of insurance should prevent her from having access to a full range of reproductive health care, including contraception and abortion services;" that "[a]ccess to contraception has been directly connected to the

economic success of women and the ability of women to participate in society equally;" and that restricting "abortion coverage interfere[s] with a woman's personal, private pregnancy decision making, with his or her health and well-being, and with his or her constitutionally protected right to safe and legal medical abortion care." 2018 Wash. Sess. Laws, ch. 119 § 1.

Relevant here, the law has two parts. First, health plans issued or renewed after January 1, 2019, must provide coverage for all contraceptives approved by the federal Food and Drug Administration, voluntary sterilization procedures, and any services necessary to provide the contraceptives. Wash. Rev. Code § 48.43.072(1). This coverage cannot be subject to cost sharing or a deductible, unless the health plan is part of a health savings account. Wash. Rev. Code § 48.43.072(2)(a). Carriers cannot deny coverage when the contraceptive method changes within a 12-month period, and the health plan cannot impose any restrictions or delays on the enrollee's ability to receive this coverage. Wash. Rev. Code §§ 48.43.072(3), (4). These benefits must be offered to all enrollees, their enrolled spouses, and their enrolled dependents. Wash. Rev. Code § 48.43.072(5).

Second, health plans issued or renewed after January 1, 2019 that provide coverage for maternity care or services must "also provide a covered person with

8

substantially equivalent coverage to permit the abortion of a pregnancy." Wash. Rev. Code § 48.43.073(1).[2]

Contrary to Cedar Park's mischaracterizations, legislators understood that SB 6219 did not supersede the conscience objection statute. During testimony on SB 6219, opponents argued that the bill "would violate the constitutionally protected rights of religious organizations and individuals." Senate Bill Rep., SB 6219. Proponents responded that the bill "is a compromise bill that protects religious organizations but still protects women's reproductive health." *Id.* Those with conscience or religious objections could still utilize the protections of Wash. Rev. Code § 48.43.065 to avoid purchasing services with which they hold a moral or religious objection. Wash. House Health Care & Wellness Comm., Pub. Hrg. Feb. 7, 2018, https://www.tvw.org/watch/?eventID=2018021058 at 33:12–39:30 (last accessed Dec. 1, 2020).

---

[2] This requirement does not apply to multistate plans, and if the application of this law to a health plan results in noncompliance with federal requirements that that are a prescribed condition to allocating federal funds to the state, then the law is inapplicable to the minimum extent necessary for the state to be in compliance. Wash. Rev. Code § 48.43.073(5). The "inapplicability of this section to a specific health plan under this subsection does not affect the operation of this section in other circumstances." *Id.*

During the course of this litigation, the Insurance Commissioner engaged in rulemaking and ultimately promulgated rules implementing the statutes. Wash. Admin. Code § 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 *et seq.* The Rule makes clear that SB 6219 does not preclude someone from exercising their rights under Washington's conscience statute: "This subchapter does not diminish or affect any rights or responsibilities provided under [Washington's conscience statute]." Wash. Admin. Code § 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(3).

**D.      After Allowing Multiple Amended Complaints and Accepting Multiple Rounds of Briefing, the District Court Dismissed Cedar Park's Suit for Lack of Standing**

Cedar Park is a Christian church, affiliated with the Assemblies of God and part of the Northwest Ministry Network. 2-ER-44–45, 69. It has deeply held religious beliefs that abortion and "abortifacient" contraceptives[3] are wrong and constitute sin. 2-ER-69.

---

[3] Cedar Park defines abortifacient contraceptives as contraceptives "that act to destroy an embryo post-fertilization." 2-ER-44. National experts in women's reproductive health state that this definition includes intrauterine devices (which are ubiquitous and have a low failure rate) as well as emergency contraception. *See* Comm. on Adolescent Health Care Long-Acting Reversible Contraception Work Grp., Am. Coll. of Obstetricians & Gynecologists, "Committee opinion no. 539: adolescents and long-acting reversible contraception: implants and intrauterine devices," Obstetrics & Gynecology Vol. 120, issue 4, at 983–88 (Oct. 2012).

In March 2019, Cedar Park filed suit against Insurance Commissioner Mike Kreidler and Governor Jay Inslee, challenging SB 6219, seeking to have it permanently enjoined. 2-ER-2–66. Cedar Park's arguments morphed as the case worked its way through the district court. Its original complaint does not mention the conscience objection statute. The State Officials moved to dismiss, arguing that Cedar Park did not suffer an injury in fact (in part because of the conscience objection statute) and the claims were not ripe. 2-ER-95–123. In turn, Cedar Park moved for a preliminary injunction and moved to file a second amended complaint adding a reference to that statute and the fact that its health plan covered "abortifacient" contraceptives. SER-1–32, 35. Cedar Park's new theory was that Washington's conscience objection statute still requires Cedar Park to pay increased premiums for the services to which it objects and treats Cedar Park differently from other religious objectors. SER-34.

The district court granted the motion to dismiss, denied the motion for preliminary injunction, and granted Cedar Park leave to file its second amended complaint. 1-ER-1–36. The district court ruled Cedar Park had provided insufficient evidence to show that SB 6219 caused its injury, as "there is no evidence about how insurance carriers have responded to an employer's attempt to invoke its conscience objections under RCW 48.43.065(3)," so any analysis

would be "an advisory opinion on a hypothetical insurance cost structure or other hypothetical harm." 1-ER-12. The district court ruled that Cedar Park's claims were not ripe because Cedar Park did not present a concrete assessment how SB 6219 will impact its interests. 1-ER-14. Cedar Park failed to support each of the three required factors for a preenforcement challenge. 1-ER-14. But the court believed that there could still be conceivable alleged facts showing that Cedar Park was treated differently as a religious employer compared to religious health care providers, health insurance carriers, and health care facilities, so further briefing would be necessary. 1-ER-22.

Cedar Park renewed its motion for preliminary injunction, filing a new declaration from its senior pastor that included emails between Cedar Park and Kaiser Permanente. 2-ER-209–25. The State Officials responded and cross-moved to dismiss, submitting a declaration authenticating a press release from the Insurance Commissioner stating that it approved a health plan from Providence that excluded some of the very health care services to which Cedar Park objected, based on the conscience statute. 2-ER-238–40.

Cedar Park moved for leave to file a third amended complaint (which it termed a "supplemental" complaint), this time alleging that its insurance carrier Kaiser Permanente informed Cedar Park that it did not offer a plan that omitted

coverage of abortion services, that it will not provide abortion exclusions to fully insured groups, that Cedar Park renewed its plan anyway, and that Kaiser Permanente will change the plan mid-year to eliminate coverage for abortion services if SB 6219 is enjoined. 2-ER-226–33. The supplemental complaint asserted the erroneous legal conclusion that the conscience statute allows Cedar Park to refuse to provide coverage for services while still allowing the insurer to charge Cedar Park a separate premium or fee for the objectionable coverage. 2-ER-228.

After accepting the supplemental Complaint, the district court granted the Motion To Dismiss and denied the Motion For Preliminary Injunction. 1-ER-23-36. The district court recognized that Cedar Park's supplemental complaint implicitly conceded that it failed to allege actual injury in its complaint. 1-ER-30. After noting Cedar Park's inconsistent position that it could present additional facts but the State Officials could not, the district court ruled that the parties did not dispute the facts, so it considered that evidence when analyzing whether Cedar Park demonstrated standing. 1-ER-32.

The district court ruled that Cedar Park is a consumer in the marketplace and chose to "maintain a business relationship with a company that fails to provide a service meeting Cedar Park's preference despite the potential

availability of suitable alternatives." 1-ER-33. As there was no evidence whether Cedar Park's insurance carrier, Kaiser Permanente, had attempted to provide the services Cedar Park desired but been foreclosed by the State Officials, the "facts establish an absence of products in the marketplace as opposed to government directed or sanctioned religious discrimination." 1-ER-33–34. Cedar Park failed to establish that any injury was fairly traceable to SB 6219, where no facts showed the "absence of a product was *because* of SB 6219" and other insurance providers provided what appeared to be an acceptable product. 1-ER-34.

Regarding Cedar Park's Equal Protection claim, the district court concluded that Cedar Park failed to establish that it was similarly situated to health care providers. 1-ER-34. While Cedar Park has common religious beliefs with some religious providers and carriers, the statute does not discriminate based on that belief. Instead, the statute differentiates health care providers, religiously sponsored health carriers, or health care facilities "because these entities are in the business of providing health care instead of purchasing health care." 1-ER-35. Cedar Park failed to establish unequal treatment so it failed to establish an injury in fact. *Id.* Cedar Park appealed.[4]

---

[4] Cedar Park moved to supplement the record with a declaration stating that Providence did not plan to expand its services to King County. Dkt. #15-2 at 4. The State Officials opposed the motion, arguing that Cedar Park failed to

## V.    SUMMARY OF THE ARGUMENT

The district court correctly dismissed Cedar Park's supplemental complaint because Cedar Park failed to show that it suffered an injury-in-fact. The allegations and undisputed facts show that the State Officials can and have approved insurance plans that exclude services consistent with Cedar Park's religious beliefs, consistent with Washington's conscience objection statute. The fact that Cedar Park has not purchased a plan consistent with its religious beliefs is not the result of the State Officials' actions or inactions, but rather is the consequence of business decisions by health insurance carriers about the services they cover in their plans.

Further, even had Cedar Park demonstrated standing, its narrow equal protection claim—the sole claim Cedar Park focuses on in its brief—fails. Washington's conscience statute, Wash. Rev. Code § 48.43.065, does not distinguish based upon religion between religious employers and religious health care providers, insurance carriers, and health care facilities. Rather, the statute

---

demonstrate extraordinary circumstances to supplement the record and the declaration supported dismissal because it showed Providence made the independent business decision not to expand its coverage to King and Snohomish Counties, rather than acting at the direction of Defendants. Dkt. #16.

distinguishes based upon the relative roles in the marketplace, which has no relation to their religious views.

Moreover, Cedar Park's claims are legally deficient under Fed. R. Civ. P. 12(b)(6). SB 6219 is generally applicable and not focused on religion and is rationally related to its purposes of promoting health and gender equality, so Cedar Park's free exercise claim fails. SB 6219 does not advance or promote religion, causing the establishment clause claims to fail. And health insurance requirements are not part of ecclesiastical decisions, which defeats the religious autonomy claim. This Court should affirm.

## VI.   STANDARD OF REVIEW

This Court reviews de novo a dismissal for lack of subject matter jurisdiction. *Rattlesnake Coal. v. E.P.A.*, 509 F.3d 1095, 1100 (9th Cir. 2007). Fed. R. Civ. P. 12(b)(1) requires a court to dismiss a complaint that fails to allege facts establishing subject matter jurisdiction. *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). Without standing, the Court lacks Article III subject matter jurisdiction and the case must be dismissed. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). The plaintiff bears the burden to establish the Court's jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

Courts also must dismiss complaints under Rule 12(b)(6) if "there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011). A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if it contains factual content that allows the court to draw a reasonable inference that the defendant may be liable. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Court must accept as true all material allegations in the complaint, as well as reasonable inferences drawn from them, and the complaint must be read in the light most favorable to the nonmoving party, the Court must not accept allegations that "are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). In other words, the Court should "disregard '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

Cedar Park alleged both a facial and as-applied challenge to SB 6219. "As a general matter, a facial challenge is a challenge to an entire legislative

enactment or provision." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011). A statute is facially unconstitutional if "it is unconstitutional in every conceivable application, or it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (internal quotations omitted). To prevail on a facial challenge, there must be no possible application of the law that could survive a legal challenge. *Id.* By contrast, an as-applied challenge contends that the law is unconstitutional as applied to the litigant, even though the law may be capable of valid application to others. *Id.* "A successful as-applied challenge does not render the law itself invalid but only the particular application of the law." *Id.* A plaintiff asserting an as-applied challenge must show only that the law as applied to the plaintiff's unique circumstances violates its constitutional rights. *Id.*

## VII.   ARGUMENT

### A.   Cedar Park Did Not Suffer an Injury-in-Fact, So Its Claims Are Not Justiciable

Cedar Park failed to show that it has suffered an injury-in-fact or that its claims are redressable by the district court. To satisfy Article III's "case or controversy" requirement, a plaintiff "must show that (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent,

not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018). "Article III standing requires a concrete injury even in the context of a statutory violation." *Bassett*, 883 F.3d at 779. Standing is "claim-and relief-specific," such that a plaintiff must establish the harm or risk of real harm must actually exist and be real, not abstract. *Id.*

    **1.**    **Cedar Park failed to show that it cannot purchase a health plan consistent with its beliefs because of the State Officials' actions or inactions**

At best, the record shows that Cedar Park's current plan might provide coverage for the services to which it objects and that the insurance carrier from whom Cedar Park purchased its health plan might not offer a plan that accommodates Cedar Park's objections. But the record does not show that either of these facts resulted from the State Officials' actions. In fact, the Insurance Commissioner approved health plans filed by Providence Health Plan for sale in the individual market that would accommodate religious objections like Cedar Park's. The Insurance Commissioner approved this plan consistent with the

requirements of Wash. Rev. Code § 48.43.065. Cedar Park has failed to show that it cannot purchase a health plan consistent with its religious beliefs because of the State Officials' actions or omissions.

Cedar Park cites no authority for the proposition that the free exercise clause or equal protection clause mandates Washington to ensure that the private insurance market offers coverage at Cedar Park's preferred rate. Under Cedar Park's theory of Article III standing, any change in cost for a good or service occurs after a change in public policy would constitute sufficient injury to give a party standing to sue. Notably, Cedar Park does not allege that Washington has not permitted an acceptable insurance carrier from operating in the region. *See* Opening Br. at 52–53. Nor does Cedar Park allege that SB 6219 renders it impossible for an insurance carrier to offer an acceptable plan. In fact, Cedar Park acknowledges that "the Insurance Commissioner approved Providence Health Plan to sell three plans" in six Washington counties. *Id.* at 52. At best, Cedar Park's injury amounts to a complaint that it cannot cover its employees at its preferred price. That is not a cognizable injury.

The alleged absence of suitable policies in counties where Cedar Park is located is traceable to private market decisions, not to SB 6219. Providence's lack of "current plans to expand" to new counties, including those where Cedar

Park is located, is the result of private business decisions made by private parties. Dkt. #15-2 at 6. Were SB 6219 to render it impossible for any insurance carrier to offer an acceptable plan within Washington for religious objectors, Cedar Park may have a stronger argument. But that is not the case: the very fact that Providence offers a plan in six different counties within Washington but declined to expand suggests that the private market—not public policy—is the source of Cedar Park's grievance. Injuries traced to private decision-makers not before the court do not suffice to confer Article III standing on a litigant. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (injury not fairly traceable to defendant when it relies on "independent action of some third party not before the court").

Moreover, Cedar Park's inability to obtain the insurance it desires is not traceable to Washington's policy, even though the policy may have altered the underlying market conditions. In *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976), the Court held that indigent users of hospitals' charitable services did not have standing to sue the Secretary of Treasury and the Commissioner of Internal Revenue for promulgating a rule that altered tax incentives to discourage private hospitals from offering services to clients who could not pay. *Id.* at 40–42. Even though the hospitals previously offered care to

21

indigent clients and changed their policies as a result of the rule, the Court held that the injury was not traceable to the rule. *Id.*

Here, Cedar Park's claim suffers the same deficiency. Cedar Park cannot sue Washington for the decisions made by private actors within that market. Because SB 6219 does not bar carriers like Providence from offering acceptable coverage, Cedar Park's alleged injury is not caused by Washington.

Nor can market conditions be redressed by the remedy Cedar Park requests. Notwithstanding Cedar Park's claims to the contrary, the record does not suggest that Kaiser Permanente would elect to offer a plan that excludes coverage for abortions. At best, the email with a sales representative from Kaiser merely suggests that the carrier is capable of "support[ing] a mid-year change" to coverage for Cedar Park's employees. *See* 2-ER-213. But courts are not in the business of speculating what market decisions third parties will make as a result of a judicial order. *See Simon*, 426 U.S. at 43 ("It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services."). The district court correctly concluded that Cedar Park's requested relief is speculative and not suitable for judicial resolution.

At bottom, Cedar Park asks this Court to make an unprecedented and incorrect holding that state actors must direct companies (whether secular or not) to offer services or products that comport with a private organization's religious beliefs. Such a holding would impermissibly favor religion over the secular, which the First Amendment forbids. *See e.g., McCreary County v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005). Insurance carriers have just as much a right to decide to offer only plans that include abortion services, based on their own beliefs or business decisions, which Cedar Park asks the Court to disregard.

### 2. The district court properly considered the Insurance Commissioner's press release

Much of Cedar Park's brief focuses on the red herring of the district court considering a declaration that authenticated a press release by the Insurance Commissioner. Cedar Park's arguments should be rejected for several reasons.

*First*, on a Rule 12(b)(1) motion to dismiss for lack of standing, "a court may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). The court "also need not presume the truthfulness of the plaintiffs' allegations." *Id.* The *White* Court affirmed the district court's consideration of an agency's memorandum, press release, and field handbook

that were issued after the filing of the complaint to establish a lack of injury. *Id.*
at 1242–43. Here, the State Officials submitted a press release showing that the
Insurance Commissioner had approved a plan in six counties that did not include
abortion services, in accordance with the provider's religious beliefs. Like in
*White*, it was appropriate for the district court to consider this fact when
assessing whether Cedar Park had standing to bring its claims.

*Second*, Cedar Park does not dispute the facts in the press release, but
instead makes the argument that because it is undisputed, it was improperly
considered. Cedar Park misunderstands the civil rules in arguing that for there to
be a "factual attack," there must be a factual dispute. *White*, 227 F.3d at 1242-43.
It makes no sense to forbid a district court from considering on a Rule 12(b)(1)
motion to dismiss undisputed facts that happened to be omitted from the
complaint. To hold otherwise would incentivize plaintiffs to omit material
undisputed facts in order to avoid a dismissal. Such a holding is illogical and
inconsistent with well-settled case law. *Id.* at 1242.

*Third*, Cedar Park relies on an inapposite case. Opening Br. at 54 (citing
*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004)). There, this Court
reversed dismissal of a statutory claim because jurisdiction and the merits of the
action were entertained, where the statute provided for both the subject matter

jurisdiction of the federal court and the substantive claim for relief. *Meyer*, 373 F.3d at 1040. Here, Cedar Park brings constitutional claims, and the standing question is not intertwined with the merits of the claims. And even if they were intertwined, the court can resolve the motion if the material facts are not in dispute, as here. *Rosales v. United States*, 824 F.2d 799, 802–03 (9th Cir. 1987); *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905 F. Supp. 2d 1158, 1167–68 (E.D. Cal. 2012).

*Fourth*, the result would be the same even if the Court did not consider the press release. *See Safe Air for Everyone*, 373 F.3d at 1039 (a facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction"). Cedar Park's supplemental complaint recognizes that the Insurance Commissioner approved plans consistent with its religious beliefs. 2-ER-226–33. Cedar Park's allegations alone are insufficient to demonstrate that it suffered an injury-in-fact.

### 3. *Skyline* is not on point

Cedar Park's reliance on this Court's ruling in *Skyline Wesleyan Church v. California Dep't of Managed Health Care*, 968 F.3d 738 (9th Cir. 2020), is misplaced. In *Skyline*, the California Department of Managed Health Care (DMHC) sent letters to seven insurance carriers—including Skyline's

carrier—mandating that they modify their coverage plans to include abortions. *Id.* at 744. Critically, those letters "did not state that there was any exemption based on an employer's objection to abortion, or that there would be a process for applying for exemptions in the future." *Id.* As a result of the agency action, the modified coverage was inconsistent with Skyline's religious beliefs, and Skyline sought coverage from a different carrier with preferable restrictions on abortion coverage. *Id.* at 745.

Here, three critical distinctions are fatal to Cedar Park's comparison to *Skyline*. First, there was no agency action forcing Kaiser to include abortion-related coverage in Cedar Park's policy prior to the end of the plan year. *See Skyline*, 968 F.3d at 744. In fact, the AGO Opinions suggest alternative methods for Kaiser and other insurance carriers to comply with state law while respecting the religious objections of employers like Cedar Park. Wash. Op. Att'y Gen. 10 (2006); Wash. Op. Att'y Gen. 5 (2002). Providence has offered a health plan that excludes the type of abortion coverage Cedar Park objects to, but made a business decision to limit the counties where their health plans are offered. That Kaiser apparently chose not to seek "approval of an appropriate plan to accommodate Cedar Park" indicates that Cedar Park's carrier made a private business decision or a directive from the state insurance regulator. 1-ER-33.

Unlike in *Skyline*, these business decisions were not the result of a "determinative or coercive" effect of Washington law. 968 F.3d at 750. Kaiser, Providence, and other insurance carriers are welcome to offer acceptable coverage to Cedar Park in the market. The carriers' decision not to do so does not give Cedar Park standing to sue Washington.

Second, unlike the appellant in *Skyline*, Cedar Park cannot claim that, prior to the passage of SB 6219, it had coverage tailored to its religious preferences, as Cedar Park's prior (and current) plan includes coverage for some of the "abortifacient" contraceptives to which Cedar Park claims it morally objects. Cedar Park cannot claim that before the passage of SB 6219, or any enforcement by the Insurance Commissioner, it had coverage that was "consistent with its religious beliefs." 968 F.3d at 746. This lack of specifically tailored coverage was not due to any action by the State Officials. In contrast to the letter directives in *Skyline*, the regulatory action the State Officials have taken to enforce SB 6219 includes promulgating rules that make it clear that Cedar Park's ability to object to coverage is protected.

Further, Kaiser and Providence offered Cedar Park an alternative that would permit it to use their services to maintain health care coverage for its employees that complies with the broad protections of the Affordable Care Act,

while "carv[ing] out abortion" coverage. 2-ER-214–15. Cedar Park alleges that this option is too costly, but this argument does too much: were a cost increase sufficient to confer Article III standing on a party, any consumer in any market would have standing to challenge when the cost of a good or service increased following a change in a government's policy.[5] Opening Br. at 40. Skyline was forced either to abandon its carrier altogether or pay for services that were inconsistent with its religious beliefs. *Skyline*, 968 F.3d at 745–46 ("Aetna informed Skyline's broker that it no longer offered any options that restricted coverage for legal abortion, because of 'the []California abortion mandate.'"). Cedar Park, on the other hand, has alleged it must simply must pay more to enjoy more tailored coverage than it enjoyed prior to the passage of SB 6219, with the assistance of Kaiser as a third party administrator. That complaint does not suffice to invoke the jurisdiction of Article III courts.

---

[5] This also distinguishes this case from the holding in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014), which states that "a law that operates to as to make the practice of . . . religious beliefs more expensive in the context of business activities imposes a burden on the exercise of religion." (Internal quotations omitted). In *Hobby Lobby*, the regulations and statutes at issue directly required religious organizations to purchase services that conflicted with their religious beliefs, so the plaintiff suffered an injury in fact. The Court did not go so far to say that any incidental effect of a policy on a religious organization created a sufficient injury in fact.

**B.      The District Court Correctly Dismissed the Equal Protection Claim**

By the second amended complaint, the case had been limited to a narrow equal protection claim that Cedar Park was treated differently than other religious organizations. The district court correctly dismissed that claim, reasoning that Cedar Park was not treated differently because of religion, but rather because of different roles within the marketplace. Cedar Park appears to exclusively focus on this claim on appeal.

The Equal Protection Clause prohibits a state from denying to any person in its jurisdiction the equal protection of laws. It directs "that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prevail, a plaintiff must "show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citing *Washington v. Davis*, 426 U.S. 229, 239–40 (1976)). Courts must engage in a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). A discriminatory purpose implies that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects

upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). An equal protection claim fails "by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005) (claim that the city's certification process was racially discriminatory failed when there was no evidence of discriminatory intent) (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986)). "Evidence of different treatment of unlike groups does not support an equal protection claim." *Thornton*, 425 F.3d at 1168. "The groups need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014).

Here, Cedar Park alleged that "RCW § 48.43.065 is not neutral and generally applicable because it treats health care providers, carriers, and facilities more favorably than churches like Cedar Park." 2-ER-196. The premise appears to be that because section 48.43.065 allows providers, carriers, and facilities to refuse to provide services to their employees, the section is discriminatory against churches who do not qualify as providers, carriers, or facilities. This is wrong for at least three reasons.

30

*First*, subsection 48.43.065(2)(a) does not provide a broader exemption for health providers, carriers, and facilities, but provides that "[n]o individual health care provider, religiously sponsored health carrier, or health care facility may be required by law or contract in any circumstances to participate in the provision of or payment for a specific service if they object to so doing for reason of conscience or religion." The statute thus makes clear that the exemption is based on the fact that an "individual health care provider, religiously sponsored health carrier, or health care facility"—unlike churches, such as Cedar Park—are in the business of either directly providing or paying for "a specific [health care] service." Wash. Rev. Code § 48.43.065(2)(a). If Cedar Park is treated disparately, it is because it does not "participate in the provision of or payment for a specific service," and not because it is a church.

*Second*, by arguing that it is somehow treated less favorably because there is no requirement that health care providers, health carriers, or health care facilities provide enrollees with the services not provided for reason of conscience or religion, Cedar Park ignores the distinct roles that each plays in the health care system. It also misstates how section 48.43.065 works in its entirety. A health care provider or health care facility actually performs medical services, so they are licensed and heavily regulated. When the actual service is

31

one a provider objects to, that provider is not required to provide that service. Cedar Park is not licensed or authorized to provide medical services as an individual provider or facility. As such, it cannot lawfully be required (or permitted) to provide any medical services (objected to or not). Cedar Park, like providers and facilities, is not obligated to provide services it objects to for reason of conscience or religion.

Insurance carriers similarly have a distinct, and highly regulated, role in the market. Carriers collect premiums from purchasers in order to cover the costs of all the particular services that carriers anticipate they ultimately will have to pay providers to render. Premiums are not a direct payment for specific services, as no actual services have been rendered when premiums are paid. Rather, premium payments secure the promise that all the services covered by a health plan will be paid, but premiums cannot be characterized as payments for any specific service, where some of the services covered by a health plan will never be rendered to a particular group or individual. Employers like Cedar Park purchase health plans that are intended to cover a multitude of services, but employers are not paying for a "specific service" when they pay premiums. As Cedar Park recognizes, it can create a self-funded program to directly pay for specific services, but it has declined that option. Cedar Park thus cannot claim

that it is being required to pay for particular services. Since religious employers like Cedar Park are not required to provide or pay for specific services, unlike an insurance carrier who does have to provide specific services, Cedar Park is not treated disparately under section 48.43.065(3).

*Third*, the statutory scheme does not impose heightened obligations on objecting employers as compared to carriers. Unlike employers, religious carriers are obligated to provide notice and information to their enrollees about how to access services. Wash. Rev. Code § 48.43.065(2)(b). There is no such similar obligation imposed on employers. Wash. Rev. Code § 48.43.065(3)(b). While enrollees are entitled to access services and receive coverage for mandated services, the Commissioner is authorized to promulgate rules to ensure enrollee coverage and access are protected as required by subsections 48.43.065(2) and (3). The Rule ensuring coverage and access assigns the burden exclusively to the carrier. Wash. Admin. Code § 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. No such obligation exists on employers. *Id.*; Wash. Rev. Code § 48.43.065(3).

Cedar Park implies that since carriers cannot be required to forego payment for services that are objected to, all carriers will insist on charging Cedar Park a premium that includes payment for these services, either directly or indirectly, regardless of whether Cedar Park chooses to assert its conscience

rights. 2-ER-191, ¶ 71. But Cedar Park failed to allege a factual basis for that conclusory assumption. *Id*. The district court correctly refused to rely on this conclusory conjecture. *See Daniels-Hall*, 629 F.3d at 998.

Even then, for an insurance carrier with a religious objection to abortion, the Washington State Department of Health Family Planning provides the necessary coverage and access for services to which the carrier objects. 2-ER-255. Cedar Park has not alleged that this or a similar program would not be available for plans sold to objecting employers. Cedar Park has not alleged that all carriers necessarily will impose a direct or indirect fee on Cedar Park in order to account for the cost of covering the services to which Cedar Park objects.

Cedar Park's equal protection claim thus fails, because it did not suffer an injury-in-fact caused by the Defendants' acts. *See Clapper v. Amnesty Int'l USA*, 586 U.S. 398, 416–18 (2013) (ongoing injuries are not fairly traceable to defendants when plaintiffs inflict harm on themselves based on fears of hypothetical future harm); *Bassett v. ABM Parking Servs., Inc.*, 883 F.3d 776, 779 (9th Cir. 2018) (standing requires a concrete injury). If anything, the Insurance Commissioner's approval of Providence's plans demonstrate that SB 6219 will not prevent a carrier from offering a plan that can be specifically

tailored to an employer's conscience or religious objections. Any theoretical injury to Cedar Park is caused by the market, not the Defendants, meaning that an order of this Court in favor of Cedar Park would not redress any possible harms. *See Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.*, 465 F.3d 1123, 1124–25 (9th Cir. 2006) (claims not redressable because any prospective relief "depends on an independent actor who retains 'broad and legitimate discretion the courts cannot presume either to control or to predict.'"). A decision in favor of Cedar Park cannot compel or ensure the existence of a private market that suits Cedar Park's desires. And Cedar Park fails to state a claim upon which relief can be granted because section 48.43.065 does not discriminate against religious employers and religious carriers, providers, and facilities based on religion.

## C.  Even if Cedar Park's Claims Were Justiciable, It Fails to State a Claim

Even if Cedar Park's claims were justiciable, they fail as a matter of law. SB 6219 is neutral both facially and as applied to Cedar Park because the law applies to all health plans regardless of religion. It meets the requisite rational basis standard of review, as it rationally effects the government interests in providing effective health care, promoting gender equality, and ensuring a

woman's right to privacy in her pregnancy decision-making, among other interests.

### 1.    Cedar Park fails to allege a cognizable free exercise claim

An individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 878– 79 (1990). Even if a law incidentally burdens a particular religion or practice, the law can be upheld if it is a "valid and neutral law of general applicability" and is rationally related to a legitimate government interest. *Stormans, Inc. v. Wiesman* (*Stormans II*), 794 F.3d 1064, 1075–76 (9th Cir. 2015) (internal quotations omitted); *see Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir. 1999) (DMV can require applicant to divulge social security number in conflict with plaintiff's religious beliefs). Laws that are not neutral or are not generally applicable are subject to strict scrutiny. *Stormans II*, 794 F.3d at 1076. The test for neutrality and general applicability are interrelated, and failure to satisfy one requirement likely indicates that the other has not been satisfied. *Id.* (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

### a.    The text and operation of SB 6219 are neutral

Courts examine both the text and operation of the law to assess whether it is neutral to religion. *Lukumi*, 508 U.S. at 533–34; *Stormans II*, 794 F.3d at 1075–76. A law is not facially neutral when, looking at its language or context, it refers to a religious practice without a secular purpose. *Lukumi*, 508 U.S. at 533. A law operates neutrally so long as it does not target a religious tenet or practice while appearing neutral on its face. *Id.* at 534. Courts must be "'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (quoting *Mueller v. Allen*, 463 U.S. 388, 394–95 (1983)).

Even if a facially neutral law disproportionately burdens a religious entity, it does not automatically lose its neutrality. *Stormans II*, 794 F.3d at 1077. "The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct." *Id.* (citing *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878)). A law is not neutral if it operates as a "covert suppression of particular religious beliefs." *Id.* But a plaintiff must show more than "awareness of consequences"; it must prove that the law was enacted "because of, not merely in spite of," its impacts on a

particular religion or religious belief or practice. *Iqbal*, 556 U.S. at 676–77; *Lukumi*, 508 U.S. at 540.

Here, SB 6219's text is neutral. SB 6219 does not facially target a particular religion. Rather, the law deals with ensuring health plans include certain preventative services, such as contraception, and if they provide coverage for maternity care, they also provide equivalent coverage to permit an abortion. Wash. Rev. Code §§ 48.43.072, .073. SB 6219 does not reference any religious practice, conduct, or motivation.

SB 6219 operates neutrally. Under the Insurance Commissioner's interpretation, individuals and organizations can refuse to purchase health plans that cover services that conflict with their conscience or religious beliefs. This precludes any inference that SB 6219 was enacted "because of" the impacts it would have on a particular religious belief. *See Iqbal*, 556 U.S. at 676–77 (plaintiff must plead sufficient facts to show that the government agency adopted and implemented policies for the purpose of discriminating on account of religion). For this reason alone, SB 6219 operates neutrally.

The legislative findings also show the law operates neutrally. The purposes of SB 6219 include promoting gender equity and women's reproductive health; ensuring that a woman's income level does not prevent her

from receiving the full range of care; reducing negative health and social outcomes from unintended pregnancies, such as delayed prenatal care, maternal depression, increased risk of physical violence during pregnancy, low birth weight, decreased mental and physical health during childhood, and lower education attainment for the child; ensuring women obtain access to contraceptive methods that are most effective for their health; and ensuring women maintain their rights to personal, private pregnancy decision-making, consistent with their constitutionally protected right to safe abortion care. 2018 Wash. Sess. Laws, ch. 119 § 1. These are SB 6219's express purposes and what the operative language seeks to achieve. Neither the purposes nor the language focuses on religion—they both focus on public health, economic inefficiencies, and preventing long-term harms. These are not uniquely applicable to a particular religious view—they apply to the secular and religious alike.

While Cedar Park speculates that evidence will show the underlying purpose for SB 6219 is to target religion, Cedar Park must rely on more than mere allegations that are "consistent with [its] favored explanation" to survive a motion to dismiss. *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013). Cedar Park needed to allege more, *i.e.*, "facts tending to exclude the possibility that the alternative explanation is true." *Id.*; *see also Twombly*,

550 U.S. at 554, 557, 567. Lacking such facts, Cedar Park failed to sufficiently allege that the SB 6219 targeted religion.

### b.    SB 6219 is generally applicable

Whether a law is generally applicable turns on whether the law selectively imposes "burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. The general applicability inquiry examines whether the law selectively prohibits religiously motivated conduct while allowing "substantial, comparable secular conduct" that is just as harmful to the law's purpose. *Stormans II*, 794 F.3d at 1079; *see Lukumi*, 508 U.S. at 543. If a law pursues the government's interest only against conduct motivated by religious belief but fails to include in its prohibits substantial, comparable secular conduct that would similarly threaten the government's interest, the law is not generally applicable. *Stormans II*, 794 F.3d at 1080. If a statute exempts conduct, the courts examine whether the exemptions are tailored to specific, secular purposes so as to not impair the general applicability of a law. *Id.*

Here, SB 6219 applies to all health plans in Washington, so it does not target health plans only for religious entities. If any purchaser wishes to express religious beliefs by refusing to purchase a plan containing coverage for services with which it disagrees, it may do so under Wash. Rev. Code § 48.43.065(3).

SB 6219 is generally applicable to all plans, and all plan purchasers may invoke their free exercise rights set forth in section 48.43.065. The Legislature, which is presumed to be familiar with its prior enactments, passed SB 6219 within the existing regulatory context, specifically section 48.43.065, recognizing that Washington's health insurance laws included a religious accommodation. *Baker v. Teachers Ins. & Annuities Ass'n*, 588 P.2d 1164, 1167 (Wash. 1979) (Legislature is presumed to be familiar with its prior enactments).

In its complaint and documents, Cedar Park identifies some insurance or insurance-like products that are exempt from the definition of a "health plan" found in section 48.43.005(26). But those exemptions, all of which predate SB 6219, relate to (1) specific types of insurance products that only incidentally include health care services; (2) are not designed to be comprehensive health plans due to duration or very limited benefits; or (3) are particular health care options funded by entities the Insurance Commissioner does not have jurisdiction over (like Medicare). Contrary to Cedar Park's implications otherwise, SB 6219's requirements apply to all health plans, as defined by subsection 48.43.005(26). And like in *Stormans II*, any exemption is "tied directly to limited, particularized, business-related, objective criteria," so they do not give the Insurance Commissioner unfettered discrimination to

discriminate. 794 F.3d at 1082. Whether SB 6219 or section 48.43.065 includes a religious exemption is irrelevant because one exists in section 48.43.065. While Cedar Park includes conclusory and speculative allegations, there is no specific allegation demonstrating SB 6219 was enacted to target a particular religion or belief system.[6]

Cedar Park instead alleges that because at least one insurance issuer was exempted from SB 6219's requirements, the law cannot be generally applicable. Putting aside that section 48.43.065 provides protections to insurance issuers, health providers, *and* individuals or organizations on the basis of a conscience or religious objection, the "mere existence of an exemption that affords some minimal governmental discretion does not destroy a law's general applicability." *Stormans II*, 794 F.3d at 1082. Cedar Park must show that any exemption resulted from religious animus, which is not the case here. *Id.* (quoting *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007). Contrary to Cedar Park's allegations, the exemptions in section

---

[6] Following Cedar Park's logic, since there are exemptions, any statute with the term "health plan" in Washington Revised Code § 48.43 is not neutral or generally applicable, but subject to strict scrutiny. Nothing indicates that SB 6219 was motivated by religious discrimination. The chapter's requirements extend to specific health plans and are not gerrymandered to burden religion.

48.43.065 apply to all individuals or entities with conscience or religious objections.

### c. SB 6219 is rationally related to a legitimate governmental purpose

A neutral and generally applicable law must be upheld against a free exercise challenge if it is "rationally related to a legitimate governmental purpose." *Stormans II*, 794 F.3d at 1084. Here, the legislative findings identify at least 14 different governmental purposes in enacting SB 6219, which include:

- better access to health benefits, which provides all Washingtonians the opportunity to lead healthier and more productive lives;

- protecting gender equity and women's reproductive health;

- providing essential primary care to women and teens, particularly since reproductive health issues are the primary reason they seek routine medical care;

- access to contraceptives, which is connected to economic success of women and the ability to participate in society equally; and

- minimizing restrictions on abortion coverage that would interfere with a women's personal, private pregnancy decision-making and her constitutionally protected right to safe and legal abortion care.

2018 Wash. Sess. Laws, ch. 119 § 1.

SB 6219 rationally implements those purposes by requiring health plans to provide contraceptive care, and if the plan includes maternity care, to provide equivalent coverage for abortion services. The requirements of SB 6219 are tied directly to the purposes the Legislature identified. SB 6219 does not change subsection 48.32.065(3)(1), but the two are read together in concert. *See Am. Bankers Ass'n v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005) (a court's "goal in interpreting a statute is to understand the statute as a symmetrical and coherent regulatory scheme and to fit, if possible, all parts into a . . . harmonious whole") (internal quotations omitted); *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 527 (9th Cir. 2001) (when interpreting state statute, courts apply state rules of statutory construction); *Quadrant Corp. v. State Growth Mgmt. Hearings Bd.*, 110 P.3d 1132, 1139–40 (Wash. 2005) ("the court begins with the statute's plain language and ordinary meaning, but also looks to the applicable legislative enactment as a whole, harmonizing its provisions by reading them in context with related provisions and the statute as a whole") (internal quotations omitted).

Cedar Park submits that it is irrational to force it and its employees to pay for abortion coverage, since they share the belief that abortion is wrong. But Cedar Park might not pay indirectly for coverage at all, as it is possible that funds to cover the objectionable services might come from third parties or grants. And

44

it is also possible that family members who are on the insurance plan might have different religious views.[7]

Even if strict scrutiny applied, SB 6219 serves the compelling state interest in promoting public health caused by unintended pregnancies. The legislative findings bear out the benefits from that governmental interest, including better health care for the citizens at reduced costs. The law is narrowly tailored to achieve those ends while respecting religion, particularly where it allows churches and religious organizations to refuse to purchase health plans that cover services that they object. The law ensures that women (and men) receive the services that make a healthier Washington and reduce health costs while ensuring those with religious objections can exercise their rights.

## 2. Cedar Park failed to allege a cognizable establishment clause claim

An Establishment Clause violation exists when a law "(1) has a predominantly religious purpose; (2) has a principal or primary effect of

---

[7] Cedar Park has pointed to *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006), which is inapposite. There, the Government allowed one group to practice their religion by taking controlled substances while forbidding another group that practiced its religion by taking a different controlled substance. *Id.* Here, by contrast, Wash. Rev. Code § 48.43.065 allows all religious groups to object to coverage of services that conflict with their beliefs.

advancing or inhibiting religion; or (3) fosters excessive entanglement with religion." *Catholic League for Religious & Civil Rights v. City & County of San Francisco*, 624 F.3d 1043, 1060 (9th Cir. 2010) (en banc) (Silverman, J. concurring); *see Lemon v. Kurtzman*, 403 U.S. 602 (1971).

*First*, as explained above, SB 6219 has the governmental purpose of providing better health care to women and teens, improving gender equity, promoting income equality, promoting income equality between genders, providing individuals with the best contraceptive care that meets their particular health needs, and securing women's privacy in personal pregnancy decision-making and the constitutional right to legal abortion care. 2018 Wash. Sess. Laws, ch. 119 § 1. These purposes are not predominantly religious in nature—they are views found among the religious and secular alike.

*Second*, SB 6219 does not have the primary effect of advancing or disapproving of religion. A primary effect is when "it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1398 (9th Cir. 1994). Courts examine the primary effect from the perspective of an informed and reasonable observer. *Am. Family Ass'n, Inc. v. City & County of San Francisco*, 277 F.3d 1114, 1122 (9th Cir. 2002).

Disapproval or inhibition must objectively be construed as the primary effect of the actions, rather than merely inferred. *Id.*

SB 6219's primary message relates to women's health, equality, privacy, and freedom—not religion. Religious groups have a diversity of views concerning abortion; the law does not seek to target or advance any religious group. While Cedar Park may object to the means the Legislature chose to guarantee women's health and autonomy, that objective—not disapproving of religion—is the primary purpose and effect of SB 6219.

*Third*, nothing about SB 6219 causes the government to entangle itself in religion. While SB 6219 may touch on politically divisive issues, political divisiveness "has never been relied upon as an independent ground for holding a government practice unconstitutional." *Am. Fam.*, 277 F.3d at 1123 (quoting *Brown v. Woodland Joint. Unified Sch. Dist.*, 27 F.3d 1373, 1383 (9th Cir. 1994)). This Court explained that otherwise, "government bodies would be at risk any time they took action that affected potentially religious issues, including abortion, alcohol use, other sexual issues, etc." *Id.* In sum, there are insufficient allegations of an establishment violation.

47

### 3. Cedar Park failed to allege a cognizable "religious autonomy" claim

The religion clauses of the First Amendment together protect church autonomy in internal religious matters, which means that religious bodies have the power to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine. *See Bollard v. Cal. Province of Soc'y of Jesus*, 211 F.3d 1331, 1332 (9th Cir. 2000). While this doctrine bars courts from wading into cases involving a church's governance of "religious" or "ecclesiastical" matters, including the hiring and firing decisions of its employees, courts can adjudicate matters dealing with churches if the dispute requires "neutral principles of law, developed for use" in those kinds of disputes. *Jones v. Wolf*, 443 U.S. 595, 599–605 (1979); *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012) (firing of a teacher at a religious school was not subject to employment discrimination suit under ministerial exception). Generally applicable laws are not subject to the religious autonomy doctrine. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020); *Bollard Cal. Province of Soc'y of Jesus*, 196 F.3d 940, 948 (9th Cir. 1999).

Cedar Park's invocation of the religious autonomy doctrine is inapt, as the purchase of a health plan is not an ecclesiastical decision. It is the choice to enter

the marketplace for health care. As discussed above, SB 6219 is a generally applicable law that does not force a particular religious belief, but sets forth what must be included in a health plan subject to the State's conscience law. That religious organizations can object to purchasing health plans containing services with which they disagree shows that SB 6219 does not affect religious organizations' ecclesiastical and doctrinal decisions. Those organizations can still choose to practice and maintain their beliefs as they wish. But the church cannot dictate to the State what private companies make available on the market when the church chooses to purchase a health plan. No case dictates that private parties outside the church must comply with the church's religious views. Cedar Park's religious autonomy claim fails.

## VIII. CONCLUSION

Cedar Park has failed to allege an injury-in-fact, so the district court correctly dismissed its claims. This Court should affirm.

RESPECTFULLY SUBMITTED this 2nd day of December, 2020.

ROBERT W. FERGUSON
Attorney General

*s/ Paul M. Crisalli*
PAUL M. CRISALLI, WSBA #40681
JEFFREY T. SPRUNG, WSBA #23607
MARTA DELEON, WSBA #35779
JOYCE A. ROPER, WSBA #11322
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Paul.Crisalli@atg.wa.gov
Jeff.Sprung@atg.wa.gov
Marta.DeLeon@atg.wa.gov
Joyce.Roper@atg.wa.gov
*Attorneys for Defendants-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number:** 20-35507

The undersigned attorney or self-represented party states the following:

[X]   I am unaware of any related cases currently pending in this court.

[ ]   I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]   I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:** */s/Paul M. Crisalli*          **Date:** December 2, 2020

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number:** 20-35507

I am the attorney or self-represented party.

**This brief contains 10,664 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X]  complies with the word limit of Cir. R. 32-1.

[ ]  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ]  is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ]  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ]  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

   [ ]  it is a joint brief submitted by separately represented parties;

   [ ]  a party or parties are filing a single brief in response to multiple briefs; or

   [ ]  a party or parties are filing a single brief in response to a longer joint brief.

[ ]   complies with the length limit designated by court order dated _____.

[ ]   is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** _/s/Paul M. Crisalli_____        **Date:** December 2, 2020_____

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate CM/ECF system on December 2, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

DATED this 2nd day of December, 2020, at Seattle, Washington.

*/s/ Paul M. Crisalli*
PAUL M. CRISALLI, WSBA #40681
Assistant Attorney General