No. 20-35507

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CEDAR PARK ASSEMBLY OF GOD OF KIRKLAND, WASHINGTON,

*Plaintiff-Appellant*,

v.

MYRON "MIKE" KREIDLER, in his official capacity as Insurance
Commissioner for the State of Washington; JAY INSLEE, in his official
capacity as Governor of the State of Washington,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of Washington
Civil Case No. 3:19-cv-05181-BHS
Hon. Benjamin H. Settle

### PLAINTIFF-APPELLANT'S REPLY BRIEF

DAVID A. CORTMAN
RORY T. GRAY
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd, NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
dcortman@ADFlegal.org
rgray@ADFlegal.org

KRISTEN K. WAGGONER
JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street, NW
Suite 600
Washington, DC 20001
(202) 393-8690
kwaggoner@ADFlegal.org
jbursch@ADFlegal.org

*Counsel for Plaintiff-Appellant*

Kevin H. Theriot
Elissa M. Graves
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
ktheriot@ADFlegal.org
egraves@ADFlegal.org

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Table of Authorities ................................................................... iii

Introduction ............................................................................... 1

Argument ................................................................................... 3

I.  Cedar Park's standing does not depend on the merit of its
    First and Fourteenth Amendment claims ....................................... 3

II. General factual allegations prove standing and Cedar Park's
    detailed complaint delivers far more. ............................................. 5

III. *Skyline* proves Cedar Park's standing and its facts are
     indistinguishable from the present case. ......................................... 8

IV. Even apart from *Skyline*, Cedar Park's Article III standing is
    beyond question. ....................................................................... 12

    A.  Cedar Park's injury is personal and concrete: it must
        include direct abortion coverage in its group health
        plan in violation of its religious beliefs. ................................ 12

    B.  Cedar Park's injury is fairly traceable to Washington's
        abortion-coverage mandate. ................................................. 16

    C.  Enjoining SB 6219's application to houses of worship
        would likely redress Cedar Park's injury ................................ 23

    D.  Holding that Cedar Park lacks standing would conflict
        with decisions by other courts of appeals and
        Washington's claims in parallel litigation. ............................ 25

V.  Nothing supports the Washington officials' argument that
    the district court properly considered extrinsic facts. .................. 27

VI. Washington's request for a 12(b)(6) dismissal on the merits
    is improper and meritless. ......................................................... 31

Conclusion ............................................................................... 37

Certificate of Compliance .......................................................... 39

Certificate of Service ................................................................ 40

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................. 4

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ............................................................ 18

*Barnum Timber Company v. United States Environmental
    Protection Agency*,
    633 F.3d 894 (9th Cir. 2011) ........................................... 29

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................. 4

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................... passim

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) .......................................... 22, 32, 36

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ............................................. 8

*Calvary Chapel Dayton Valley v. Sisolak*,
    982 F.3d 1228 (9th Cir. 2020) ......................................... 34

*Catholic League for Religious & Civil Rights v. City & County of
    San Francisco*,
    624 F.3d 1043 (9th Cir. 2010) ................................... 4, 14

*Central Rabbinical Congress of United States & Canada v. New
    York City Department of Health & Mental Hygiene*,
    763 F.3d 183 (2d Cir. 2014) ............................................ 34

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ..................................................... 34, 35

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976) .......................................................... 36

*Colorado Christian University v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ................................................ 35, 36

*Department of Commerce v. New York,*
    139 S. Ct. 2551 (2019) .................................................................. 16

*Edison v. United States,*
    822 F.3d 510 (9th Cir. 2016) ........................................................ 29

*Elrod v. Burns,*
    427 U.S. 347 (1976) ...................................................................... 15

*Empress LLC v. City & County of San Francisco,*
    419 F.3d 1052 (9th Cir. 2005) ........................................................ 7

*Harris v. KM Industrial, Inc.,*
    980 F.3d 694 (9th Cir. 2020) ........................................................ 31

*Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.,*
    761 F.3d 1027 (9th Cir. 2014) ...................................................... 28

*Heckler v. Mathews,*
    465 U.S. 728 (1984) ................................................................ 15, 25

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ...................................................................... 15

*Hosanna-Tabor Evangelical Lutheran Church & School v.*
    *E.E.O.C.,*
    565 U.S. 171 (2012) ...................................................................... 33

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ........................................................ 26

*Larson v. Valente,*
    456 U.S. 228 (1982) ...................................................................... 35

*Levine v. Vilsack,*
    587 F.3d 986 (9th Cir. 2009) ........................................................ 28

*Liberty University, Inc. v. Lew,*
    733 F.3d 72 (4th Cir. 2013) .......................................................... 26

*Little Sisters of the Poor Saints Peter & Paul Home v.*
    *Pennsylvania,*
    140 S. Ct. 2367 (2020) ..................................................................... 32

*LSO, Ltd. v.* Stroh,
    205 F.3d 1146 (9th Cir. 2000) ...................................... 12, 13, 17, 24

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................................................... 29

*Lyng v. Northwest Indian Cemetery Protective Association,*
    485 U.S. 439 (1988) ........................................................... 14, 15, 36

*Maya v. Centex Corp.,*
    658 F.3d 1060 (9th Cir. 2011) ........................................................... 5

*Mendia v. Garcia,*
    768 F.3d 1009 (9th Cir. 2014) ............................................ 16, 18, 21

*Metropolitan Washington Airports Authority v. Citizens for the*
    *Abatement of Aircraft Noise, Inc.,*
    501 U.S. 252 (1991) ......................................................................... 28

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) ........................................................... 12

*Monsanto Company v. Geertson Seed Farms,*
    561 U.S. 139 (2010). .......................................................................... 4

*Namisnak v. Uber Technologies, Inc.,*
    971 F.3d 1088 (9th Cir. 2020) ......................................................... 28

*Nayab v. Capital One Bank (USA), N.A.,*
    942 F.3d 480 (9th Cir. 2019) ........................................................... 32

*Our Lady of Guadalupe School v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ..................................................................... 12

*Pennsylvania v. President United States,*
    930 F.3d 543 (3d Cir. 2019)....................................................... 32, 33

*Priests for Life v. United States Department of Health & Human Services,*
772 F.3d 229 (D.C. Cir. 2014) ........................................................ 26

*Renee v. Duncan,*
686 F.3d 1002 (9th Cir. 2012) ........................................................ 24

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) .................................................................. 34, 35

*Safe Air for Everyone v. Meyer,*
373 F.3d 1035 (9th Cir. 2004) ........................................................ 29

*Shrum v. City of Coweta,*
449 F.3d 1132 (10th Cir. 2006) ...................................................... 34

*Simon v. Eastern Kentucky Welfare Rights Organization,*
426 U.S. 26 (1976) ....................................................................... 22

*Skyline Wesleyan Church v. California Department of Managed Health Care,*
968 F.3d 738 (9th Cir. 2020) .......................................... 2, 5, 9, 11

*Taylor v. Yee,*
780 F.3d 928 (9th Cir. 2015) ......................................................... 32

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ................................................ 4, 6, 13, 14

*Vasquez v. Los Angeles County,*
487 F.3d 1246 (9th Cir. 2007) ...................................................... 14

*Warth v. Seldin,*
422 U.S. 490 (1975) ................................................... 3, 6, 12, 24

*Werft v. Desert Southwest Annual Conference of the United Methodist Church,*
377 F.3d 1099 (9th Cir. 2004) ...................................................... 33

*White v. Lee,*
227 F.3d 1214 (9th Cir. 2000) ...................................................... 30

*Wieland v. United States Department of Health & Human Services,*
    793 F.3d 949 (8th Cir. 2015) ..........................................................26

*Wood v. City of San Diego,*
    678 F.3d 1075 (9th Cir. 2012) ........................................................30

## Statutes

Wash. Rev. Code § 48.01.080 ....................................................................17

## Rules

Federal Rules of Civil Procedure, Rule 12(b)(1)............................. passim

Federal Rules of Civil Procedure, Rule 12(b)(6)...................................2, 4

## Regulations

Wash. Admin. Code § 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(3)........................................................10

## INTRODUCTION

Washington law requires secular insurance providers to include abortion and abortifacient-contraceptive coverage in churches' group health plans, and Cedar Park's secular insurer has done just that. Since September 2019, Cedar Park has been forced to *include* and directly *pay for* abortion coverage—a flagrant violation of the church's religious belief that all life is sacred and must be protected from the moment of conception. That violation of the church's religious liberty is a concrete and particularized harm that flows directly from state law. Yet Washington maintains that Cedar Park cannot even open the door to federal court. Washington is wrong.

To begin, Washington officials confuse standing with the merits and demand that Cedar Park provide record proof at the motion-to-dismiss stage. Ample proof supports the church's claims, yet that is not the issue. General factual allegations are sufficient for standing and to state a plausible claim for relief. And Cedar Park's allegations render it probable that SB 6219's abortion-coverage mandate resulted in the church's health plan covering abortion—a harm federal courts should redress by enjoining SB 6219's application to houses of worship.

1

This Court's recent decision in *Skyline Wesleyan Church v. California Department of Managed Health Care*, 968 F.3d 738, 746 (9th Cir. 2020), reaches that exact conclusion, as do decisions by other circuits relating to analogous religious objectors. And Washington's own arguments in parallel litigation confirm the principle. If other religious objectors and Washington have standing to challenge abortion-coverage rules in federal court, Cedar Park necessarily has standing too.

What's more, the district court plainly erred by considering outside-the-four-corners-of-the-complaint evidence suggesting that Cedar Park could apply for and obtain a group policy from a secular or religious insurer that excludes abortion coverage. As Cedar Park explained in its opening brief, it is not eligible for the hypothetical policy that formed the basis of the district court's dismissal.

Given all that, Washington officials spend much of their brief arguing that this Court—in the first instance—should dismiss Cedar Park's claim on the merits, under Rule 12(b)(6). That suggestion is meritless. Cedar Park's factual allegations lead to the reasonable inference that Washington is liable for the misconduct alleged. Only by wrongly truncating First and Fourteenth Amendment protections can

Washington pretend otherwise. A decade of Affordable Care Act litigation proves that the church's claims are plausible. Accordingly, this Court should reverse the district court's dismissal order and remand for proceedings on the merits.

## ARGUMENT

### I. Cedar Park's standing does not depend on the merit of its First and Fourteenth Amendment claims.

Washington officials confuse the merits of Cedar Park's claims with Article III standing. Time and again, they give merits-based reasons for affirming the dismissal of the church's supplemental complaint under Rule 12(b)(1). For instance, Washington officials cite Cedar Park's "erroneous legal conclusion[s]," Appellees Br. 13, Washington law not "render[ing] it impossible for an insurance carrier to offer an acceptable plan," *id.* at 20, and their allegedly innocuous reasons for "treat[ing] [Cedar Park] disparately," *id.* at 31, as proving no jurisdiction.

But "standing in no way depends on the merits of [Cedar Park's] contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). "Standing is not about who wins the lawsuit; it is about

who is allowed to have their case heard in court." *Catholic League for Religious & Civ. Rights v. City & Cnty. of S.F.*, 624 F.3d 1043, 1048 (9th Cir. 2010) (en banc). It is "outrageous" for Washington to suggest that it may force Cedar Park to cover abortion in its health plan, yet the church cannot "defend [itself] in court against" this attack on its life-affirming conduct and religious "views." *Id.*

All of Washington's jurisdictional arguments boil down to one claim: the church does not have "a legally protected interest" in maintaining a group health plan that truly excludes abortion coverage. *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018). Yet "the justiciability of [Cedar Park's] claims" does not depend on "the scope of [its constitutional] rights." *Id.* Whether the church is "entitled to the relief that [it] seek[s] goes to the merits, not to standing." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 151 n.1 (2010).

Continuing to elide the difference between a standing and a merits inquiry, the Washington officials rely heavily on the Supreme Court's Rule 12(b)(6) opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Appellees

Br. 17, 38–39. But as this Court has explained, those decisions have little relevance to standing:

> *Twombly* and *Iqbal* are ill-suited to application in the constitutional standing context because in determining whether plaintiff states a claim under 12(b)(6), the court necessarily assesses the merits of plaintiff's case. But the threshold question of whether [a] plaintiff has standing (and the court has jurisdiction) is distinct from the merits of [its] claim. Rather, the jurisdictional question of standing precedes, and does not require, analysis of the merits.

*Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (cleaned up).

To prevail on appeal, Cedar Park need not prove the merits of its claims. All the church must do is show the complaint's allegations plausibly establish injury, causation, and redressability. *Skyline*, 968 F.3d at 746. That is a low bar, as Article III's requirements are "relatively modest." *Bennett v. Spear*, 520 U.S. 154, 171 (1997). And as reiterated below, Cedar Park's allegations easily satisfy that threshold. In sum, Washington's view of the *merits* of Cedar Park's claims has nothing to do with the federal courts' *jurisdiction* to adjudicate them.

## II. General factual allegations prove standing and Cedar Park's detailed complaint delivers far more.

By arguing about what "the record" does or does not show, Appellees Br. 19, 22, Washington officials mistake the standard of

review. "[G]eneral factual allegations of injury resulting from the defendant[s'] conduct" are sufficient to prove Article III standing "at the pleading stage." *Bennett*, 520 U.S. at 168.

Cedar Park must provide "*allegations* . . . that [it] personally suffered a concrete and particularized injury in connection with the conduct about which [it] complains," not *record proof. Trump*, 138 S. Ct. at 2416 (emphasis added) (cleaned up). In fact, there is next-to-no factual record because Washington convinced the district court to dismiss Cedar Park's case under Rule 12(b)(1) before discovery began.

On a motion to dismiss for lack of standing, "courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501. And they must "presume that general allegations embrace those specific facts that are necessary to support the claim." *Bennett*, 520 U.S. at 168 (cleaned up). Yet Washington faults the church for not making precise allegations that dovetail with its truncated view of the First Amendment. *E.g.*, Appellees Br. 20 ("Nor does Cedar Park allege that SB 6219 renders it impossible for an insurance carrier to offer an acceptable plan.")

6

Essentially, Washington demands that Cedar Park comply with a "heightened pleading standard, which require[s] a plaintiff's complaint to state with factual detail and particularity the basis for" its claims. *Empress LLC v. City & Cnty. of S.F.*, 419 F.3d 1052, 1055 (9th Cir. 2005). The rules of civil procedure's "liberal system of notice pleading" require no such thing. *Id.*

Yet Cedar Park would satisfy even a heightened pleading standard. The supplemental complaint explains that (1) providing abortion coverage in the church's group health plan causes Cedar Park irreparable religious harm, Appellant's Opening Br. ("Opening Br.") 6–10, 35–37; (2) SB 6219's abortion-coverage mandate caused Cedar Park's insurer to insert direct coverage for surgical and chemical abortions into the church's group health plan, *id.* at 10–13, 17–19, 34–35, 38–41; (3) neither Cedar Park nor its secular insurer have access to a religious exemption, even though such an exemption is available to other religious entities, *id.* at 13–17, 29–30, 37; and (4) Cedar Park's secular insurer would reinstate its abortion-free group health plan if a court enjoined SB 6219's application to the church, *id.* at 18, 34–35.

In sum, the standing question is not close. Cedar Park's allegations show it is "reasonably probable" that Kaiser Permanente's insertion of direct abortion coverage into its health plan was the result of SB 6219's selective abortion-coverage mandate and enjoining the mandate's application to houses of worship would remedy the church's harm. *California v. Azar*, 911 F.3d 558, 572–73 (9th Cir. 2018). That is all Article III requires.

## III. *Skyline* proves Cedar Park's standing and its facts are indistinguishable from the present case.

*Skyline* proves that federal courts have jurisdiction over Cedar Park's constitutional claims, as the church's opening brief explains. Opening Br. 32–44. Washington officials never respond to Cedar Park's legal arguments. They simply attempt to distinguish *Skyline*'s facts. Appellees Br. 25–28. But none of these alleged factual differences put Cedar Park's standing in doubt.

First, Washington officials draw a distinction based on the *source* of the abortion-coverage mandate. Appellees Br. 25–27. *Skyline* involved a California agency's regulatory decision to mandate abortion-coverage in churches' group health plans based on state laws that had never previously been construed to require abortion coverage. 968 F.3d

8

at 743–44. The agency notified insurers of this new abortion-coverage mandate through informational letters. *Id.* at 744. Washington likens these letters to enforcement actions. Appellees Br. 26. But the California agency's letters served the same purpose as Washington's passage of SB 6219: they notified insurers of a new obligation to insert abortion-coverage into churches' group health plans. So there is no daylight between this case and *Skyline*. Whether an abortion-coverage mandate is administrative or statutory is irrelevant.

Second, Washington argues that—unlike California—it offers a selective religious exemption. Appellees Br. 26–27. But, as the supplemental complaint explains, that purported exemption does not help Cedar Park. Opening Br. 15–19. Washington's passage of SB 6219 resulted in Kaiser Permanente inserting abortion coverage directly into Cedar Park's group health plan just like the California agency's letter resulted in Aetna inserting abortion coverage directly into Skyline's group health plan. *Skyline*, 968 F.3d at 744–45. The injury caused by the abortion-coverage mandate is exactly the same.

Washington's conscience statute made no practical difference to Cedar Park.[1] Nor could it. As the supplemental complaint explains, Washington law—at the very least—requires secular insurers like Kaiser Permanente to include *indirect* abortion coverage in Cedar Park's group health plan.[2] Opening Br. 13–17. And that indirect abortion coverage violates Cedar Park's religious beliefs just as much as direct abortion coverage would. *Id.* at 15. Washington officials add insult to injury by authorizing secular insurers to charge Cedar Park for indirect abortion coverage, *id.* at 14–15, as the state concedes.[3] That is not accommodation but an effort to force religious objectors to violate their beliefs.

For similar reasons, the religious exemption Washington offers to Providence Health Plan (the first religious insurer with an objection to providing abortion coverage) makes no real-world difference to Cedar

---

[1] Nor do the Insurance Commissioner's regulations make a difference. The conscience regulation merely points back to Washington's futile conscience statute. Wash. Admin. Code § 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(3).

[2] *Accord* Appellees Br. 4 ("The Legislature . . . ensured that enrollees could not be denied access to [abortion] coverage as a result of" a religious objection).

[3] Appellees Br. 33 ("carriers cannot be required to forego payment for services that are objected to").

Park. Appellees Br. 26–27. Through no fault of its own, the church *is not eligible to purchase a Providence group health plan*, Opening Br. 52–55, a reality that the Washington officials do not contest. Because no meaningful religious accommodation applies to Cedar Park or its secular insurer, the church is in the same position as Skyline: it is currently forced to cover and pay for abortion coverage in its group health plan that violates its beliefs. *Skyline*, 968 F.3d at 744–45.

Third, Washington officials spurn Cedar Park's religious objection to including abortifacient-contraceptives in its group health plan because they were included at one point based on an insurance broker's mistake. Appellees Br. 27. That argument is meritless. Cedar Park received guarantees from its broker that its group health plan excluded abortifacient-contraceptives. 2-ER-227 (incorporating 2-ER-186). When these guarantees turned out to be wrong, the church excluded abortifacient-contraceptives from its health plan as soon as it could. 2-ER-227 (incorporating 2-ER-186).

No one could reasonably expect more. Cedar Park's objection to abortion coverage is just as strong as Skyline's. And the Religion Clauses forbid Washington's attempt to impose an ideological-purity

11

test on a house of worship. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2068 (2020) ("judges have no warrant to second-guess" religious organizations' faith-based judgments).

*Skyline* is on-point and controls this case. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) ("a three-judge panel may not overrule a prior decision of the court"). This Court should reverse the district court's dismissal of the supplemental complaint.

## IV. Even apart from *Skyline*, Cedar Park's Article III standing is beyond question.

Wholly aside from *Skyline*, Cedar Park's supplemental complaint plausibly alleges injury, causation, and redressability under established Article III caselaw. And when the state's enforcement of a law "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v.* Stroh, 205 F.3d 1146, 1155 (9th Cir. 2000). The district court erred in holding otherwise.

### A. Cedar Park's injury is personal and concrete: it must include direct abortion coverage in its group health plan in violation of its religious beliefs.

Article III standing ensures "the plaintiff has alleged . . . a personal stake in the outcome of the controversy [sufficient] to warrant [the] invocation of federal-court jurisdiction." *Warth*, 422 U.S. at 498–

99. The question is whether Cedar Park "is directly affected by the laws and practices against which [its] complaints are directed." *Trump*, 138 S. Ct. at 2416.

Cedar Park's "concrete injury" is the abortion-coverage mandate's "alleged real-world effect" on its group health plan. *Id.* As the supplemental complaint illustrates, the abortion-coverage mandate's practical effect is the forced inclusion of abortion and abortifacient-coverage in Cedar Park's group health plan in violation of the church's religious belief that all life is sacred and must be protected from the moment of conception. Opening Br. 6–8, 17–19. Cedar Park puts this belief into practice in numerous ways, including (1) requiring employees to live by its pro-life teachings, (2) participating in March for Life, (3) facilitating embryo adoptions, and (4) partnering with a local pregnancy center. Opening Br. 7–8.

Covering abortion in its health plan contradicts everything that Cedar Park has said and done to promote the sanctity of human life. The church "alleges injury to its own constitutional rights," *LSO,* 205 F.3d at 1154, and that "*spiritual stake* in First Amendment values"

13

gives Cedar Park standing, *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1251 (9th Cir. 2007) (cleaned up).

The Free Exercise Clause "is primarily aimed at protecting . . . interests of a spiritual, as opposed to a physical or pecuniary, nature." *Id.* at 1250. So "spiritual . . . harm" is a well-recognized injury for standing purposes. *Catholic League for Religious & Civ. Rights*, 624 F.3d at 1050. Cedar Park's complaint alleges a model free-exercise injury: government coercion to violate its religious beliefs. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448–49 (1988). Worse yet, Washington imposes this religious pressure selectively, Opening Br. 10–17, denying the church "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449.

Washington rebuffs Cedar Park's harm as "abstract," Appellees Br. 19, or "theoretical," *id.* at 35. But standing focuses on a law's real-world effects, *Trump*, 138 S. Ct. at 2416, and Washington's abortion-coverage mandate has a "tendency to coerce [houses of worship] into acting contrary to their religious beliefs." *Lyng*, 485 U.S. at 450. Since SB 6219 took effect, Cedar Park has been forced to *include* and *pay for* abortion and abortifacient-contraceptive coverage in its group health

plan, even though it regards abortion as ending a human life formed in God's own likeness, antithetical to the Gospel, and contrary to its religious mission. 2-ER-227 (incorporating 2-ER-182). That spiritual harm is concrete and irreparable. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Contrary to Washington's assumption, it makes no difference whether Cedar Park's free-exercise injury is explicitly mandated by state law. Appellees Br. 15. "[I]ndirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment." *Lyng*, 485 U.S. at 450. And the church's equal-protection claim is the "type of personal injury [courts] have long recognized as judicially cognizable. [Cedar Park] alleges that [Washington law] subjects [it] to unequal treatment in the [availability of group insurance] benefits solely because of [its religion]." *Heckler v. Mathews*, 465 U.S. 728, 738 (1984).

Washington's (selective) abortion-coverage mandate undoubtedly "affects [Cedar Park] in a personal and individual way" and that is all Article III requires for standing. *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (cleaned up).

### B.    Cedar Park's injury is fairly traceable to Washington's abortion-coverage mandate.

Washington's chief argument is that Cedar Park's injury is not fairly traceable to the State. Appellees Br. 2, 15, 19–23. That is wrong. "Causation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury . . . ." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). The alleged causal links must simply be plausible. *Id.* at 1013. Here, they are.

Cedar Park has plausibly alleged that Washington's *abortion-coverage* mandate resulted in Kaiser Permanente inserting *abortion coverage* into the church's health plan. That is SB 6219's "predictable effect . . . on the decisions of third parties", *i.e.*, secular insurance providers. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Courts have long recognized that state action may have a "determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169. And that well-trod causation theory is what Cedar Park alleges here. Opening Br. 17–18.

SB 6219 imposes severe consequences if a secular insurance provider fails to include abortion and abortifacient-contraceptive

16

coverage in its health plans. Washington may impose jail time up to 364 days, levy fines up to $1,000, or even strip away an insurance provider's authorization to do business. 2-ER-228 (incorporating 2-ER-191); Wash. Rev. Code § 48.01.080. The result is that secular insurance providers like Kaiser Permanente *cannot* accommodate Cedar Park's religious objection to direct or indirect abortion coverage without possibly going to jail and jeopardizing the insurance providers' very existence.

In sum, SB 6219 has "direct and appreciable legal consequences" for Cedar Park. *Bennett*, 520 U.S. at 178. Now every secular insurance provider *must* include abortion coverage—directly or indirectly—in the church's health plan in contravention of its religious beliefs. Opening Br. 13–17. Given SB 6219's "substantial civil and criminal penalties," the "peril" of accommodating Cedar Park's religious beliefs is too great. *Bennett*, 520 U.S. at 170. "[F]ew, if any, [insurance providers] will be willing to risk their . . . license [to operate] in order to do business with [Cedar Park in accordance with its beliefs], and . . . this state of affairs burdens" the church's free exercise of religion. *LSO*, 205 F.3d at 1156.

No rational insurance provider will "lightly disregard [Washington's] threats to institute criminal proceeding against them if they do

not come around" to its pro-abortion dictates. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). And Kaiser Permanente's "reaction[] [to SB 6219] was no exception." *Id.* Kaiser inserted abortion coverage into Cedar Park's health plan, as any rational business would. 2-ER-227–28. SB 6219's "threat of . . . legal sanctions and other means of coercion" had Washington's desired effect: Cedar Park lost its abortion-excluding health plan. *Bantam Books*, 372 U.S. at 67.

"None of the links in [Cedar Park's] causal chain relies on speculation or guesswork." *Mendia*, 768 F.3d at 1013. The supplemental complaint alleges that "Kaiser Permanente will change the Church's plan mid-year to eliminate coverage of abortion if SB 6219 is enjoined," ER 228, which shows that SB 6219 is why Kaiser included abortion coverage in the church's plan in the first place.[4]

At this stage of the case, all Cedar Park must do is allege "facts showing that [Washington']s unlawful conduct is at least a substantial factor motivating [Kaiser Permanente's] actions." *Mendia*, 768 F.3d at

---

[4] Kaiser "will not be accommodating any abortion exclusions for fully insured groups" because "SSB 6219" requires "fully insured health plans issued after 1/1/2019 that cover maternity care or services [to] cover substantially equivalent coverage for abortion." 2-ER-214.

1013 (cleaned up). The supplemental complaint does much more. It alleges that SB 6219 is the only thing standing between Cedar Park and the abortion-excluding group health plan it had before and desires to regain. 2-ER-228.

Washington officials give four reasons why causation is lacking. None have merit. First, they point to the Commissioner's approval of three Providence group health plans that exclude abortion coverage in six Washington counties where Cedar Park does not operate. Appellees Br. 1, 19–20, 22, 34–35. Providence group plans available *elsewhere* do nothing to mitigate the real-world harm that SB 6219 has caused the church. Opening Br. 52–56.

Washington's *willingness* to accommodate religious insurance providers' objections to abortion coverage does not change its *refusal* to accommodate houses of worship like Cedar Park who share the same faith-based concern. It just highlights Washington's violation of the Equal Protection Clause. 2-ER-228–29 (incorporating 199–201). Tellingly, Washington never disputes that § 48.43.065(2)(a)'s protection is broad enough to allow health care providers, religiously-sponsored health carriers, and health care facilities to exclude abortion coverage

19

from their own employee health plans. 2-ER-228 (incorporating 2-ER-189–91).

Second, the officials claim that Cedar Park's harm is caused by the market or insurance carriers' independent business decisions. Appellees Br. 2, 15, 20, 23, 35. Not so. Washington heavily regulates the insurance market as a general matter, and SB 6219 specifically regulates abortion coverage. The law *forces* secular insurance providers to include abortion and abortifacient-contraceptive coverage in health plans—directly or indirectly—on pain of jail time, fines, and possible loss of their authorization to do business, leaving no real, independent decision-making authority. Opening Br. 11, 18–19.

Cedar Park's "injury [is] produced by [the] determinative or coercive effect [SB 6219 has] upon the action of" private insurance providers, almost all of which are secular and subject to the abortion-coverage mandate—no religious exception for churches. *Bennett*, 520 U.S. at 169. Kaiser Permanente's insertion of abortion coverage into Cedar Park's health plan was not "independent" action. Opening Br. 18–19. It was precisely what SB 6219 demanded. *Id.* at 10–12.

Washington officials concede that SB 6219 "may have *altered the underlying market conditions*." Appellees Br. 21 (emphasis added). That is an understatement. SB 6219 *set* the insurance market conditions in Washington. And it directly caused Cedar Park's harm by requiring abortion coverage in its group health plan. Opening Br. at 17–19.

Washington's only real objection is that some private decision-making by insurance providers is involved. Appellees Br. 20–22. But SB 6219 need not be "the very last step in the chain of causation" culminating in Cedar Park's injury. *Bennett*, 520 U.S. at 169. A harm is fairly traceable for standing purposes when "the government's unlawful conduct," *i.e.*, requiring abortion coverage in most group health plans with no religious exemption for houses of worship, "led third parties," *i.e.* private insurance providers, "to act in a way that injured" the church. *Mendia*, 768 F.3d at 1013.

Third, Washington officials then pivot and blame Cedar Park's harms on the church's "own business decisions." Appellees Br. 2. They appear to mean the church "can create a self-funded [insurance] program" that could exclude abortion coverage *Id.* at 32. But Cedar Park cannot afford self-insurance, Opening Br. 9–10, 40–41, which

could have severe consequences for employees and family members undergoing treatment for serious illness, *id.* at 29, 55. What's more, Washington cannot solve one free-exercise harm by imposing another. "[A] law that operates so as to make the practice of religious beliefs more expensive . . . imposes a burden on the exercise of religion." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 710 (2014) (cleaned up).

Nothing in Article III requires Cedar Park to take drastic (and hugely expensive) actions to avoid SB 6219's ill effects. That is especially true when the church already had group health insurance that complied with its religious beliefs, and self-insuring is not "financially advantageous" for Cedar Park but potentially ruinous, *id.* at 721–22; *accord* 2-ER-227 (incorporating 2-ER-185). The First Amendment does not require churches to dodge free-exercise harms, it obliges government to remedy free-exercise injuries.

Fourth, Washington tries to draw an analogy to *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976). Appellees Br. 21–22. But that case is irrelevant. There, indigent plaintiffs argued that a challenged Internal Revenue Service ruling about nonprofit tax

breaks was "'encouraging' [private] hospitals to deny [them] services."
*Id.* at 33; *accord id.* at 42. The Supreme Court held it "purely specula-
tive whether the [hospitals'] denials of service . . . fairly can be traced to
[the IRS revenue ruling's] encouragement or instead result from
decisions made by the hospitals without regard to the tax implications."
*Id.* at 42–43.

But government "encouragement" via minor tax breaks is not the
issue here. Cedar Park's supplemental complaint alleges that Washing-
ton *requires* secular insurance providers like Kaiser Permanente, to
insert abortion and abortifacient-contraceptive coverage into the
church's group health plan on threat of jail time, fines, and even
possibly losing their authorization to do business. Opening Br. 11, 18–
19. And there is nothing speculative about Cedar Park's allegations
because the abortion-coverage mandate is spelled out in SB 6219's text.

## C. Enjoining SB 6219's application to houses of worship would likely redress Cedar Park's injury.

Washington officials argue that Cedar Park cannot show
redressability because private insurers might not "elect to offer a plan
that excludes coverage for abortions." Appellees Br. 22; *accord id.* at 35.
But the supplemental complaint alleges specifically that "Kaiser

Permanente will change the Church's plan mid-year to eliminate coverage of abortion if SB 6219 is enjoined." 2-ER-228. The Court must accept this factual allegation as true. *Warth*, 422 U.S. at 502.

Moreover, Cedar Park has no duty to "demonstrate that there is a *guarantee* that [its] injuries will be redressed by a favorable decision." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (emphasis added) (cleaned up). The church only must show "that there would be a 'change in a legal status,' and that a 'practical consequence of that change would amount to a significant increase in the likelihood that [Cedar Park] would obtain relief that directly redresses the injury suffered.'" *Id.* (cleaned up).

Enjoining SB 6219's application to houses of worship amounts to a change in legal status whose practical result would be a significant increase in Cedar Park's likelihood of obtaining an abortion-excluding, group health plan from secular insurance providers. The church has no duty to plead that SB 6219 is "the *only* barrier to" Cedar Park regaining an abortion-excluding health plan or that the church "would, *in fact*, find" an abortion-excluding health plan "but for" SB 6219's application to houses of worship, *LSO*, 205 F.3d at 1156 (emphasis added).

24

Nonetheless, Cedar Park's supplemental complaint goes beyond what Article III requires and does just that. 2-ER-228.

Similarly, an equal-protection injury is redressable whenever a court can "mandate . . . equal treatment." *Heckler*, 465 U.S. at 740. Federal courts can order Washington officials to "exten[d] . . . benefits [in the form of a religious exemption] to the excluded class"—in this case houses of worship—that they already provide to a "favored class," which includes health care providers, religiously-sponsored health carriers, and health care facilities. *Id.*; *accord* Opening Br. 44. That fact, too, shows that Cedar Park's injury is redressable by the courts.

### D. Holding that Cedar Park lacks standing would conflict with decisions by other courts of appeals and Washington's claims in parallel litigation.

Lawsuits about abortion or abortifacient-contraceptive coverage abounded over the last decade. In *every* relevant case, federal appellate courts found the plaintiff had Article III standing. This Court's decision in *Skyline* is part of a five-circuit consensus that Washington asks this Court to repudiate. But when Washington is a plaintiff in abortion-coverage litigation, it sings a very different tune.

Fourth, Seventh, Eighth, and D.C. Circuit precedent supports *Skyline*'s holding. *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 90 (4th Cir. 2013) (religious university had standing to challenge an abortifacient-contraceptive mandate); *Korte v. Sebelius*, 735 F.3d 654, 667–68 (7th Cir. 2013) (same for religious owners of closely-held businesses); *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 954–56 (8th Cir. 2015) (same for religious state employee and his wife); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 241–44 (D.C. Cir. 2014) (same for Catholic nonprofits challenging the mandate and the adequacy of a religious exception).

And though the Washington officials resist that authority, they take a different position in parallel litigation. When *Washington* challenges abortion coverage or related rules, the state ditches its claim that plaintiffs do not have standing unless they prove it is "*impossible*" for them to avoid the injury alleged. Appellees Br. 20–21 (emphasis added). Instead, Washington stresses that Article III standing requires only "a substantial risk that the [alleged] harm will [even] occur." Combined Br. in Opp'n at 17, *Dep't of Health & Human Servs. v.*

*California*, Nos. 19-1038, 19-1040, 19-1053 (U.S. March 20, 2020),

https://bit.ly/3nftjgE.

Washington also rejects its claim here that increased costs are "not a cognizable injury." Appellees Br. 20. Rather, the state relies on allegations of "harming the States' fiscs," "direct financial costs," and "economic harm to the states" to establish Article III harm. Appellees' Answering Br. at 17, 20, *California v. Azar*, Nos. 19-15072, 19-15118, 19-15150 (9th Cir. April 15, 2019) (cleaned up).

If *other religious objectors* have standing to challenge abortion-coverage requirements, and *Washington* has standing to challenge religious exemptions from those requirements, Cedar Park necessarily has standing to challenge SB 6219's application to houses of worship.

## V. Nothing supports the Washington officials' argument that the district court properly considered extrinsic facts.

Washington officials argue that Rule 12(b)(1) allows courts to consider any undisputed, extrinsic facts that a defendant deems relevant to plaintiffs' standing. Appellees Br. 13, 24. No authority supports this claim.

On a motion to dismiss, the standing inquiry turns on the complaint's allegations. This Court asks whether the plaintiff's complaint

"*alleged facts* demonstrating each element of standing." *Namisnak v. Uber Techs., Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020) (cleaned up). So the plaintiff's duty is to file a complaint that "*allege[s]* personal injury fairly traceable to the defendant's *allegedly* unlawful conduct and likely to be redressed by the requested relief." *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 264 (1991) (emphasis added) (cleaned up).

In short, "at the motion to dismiss stage, a court[ ] [usually has the] obligation to take a plaintiff *at its word* . . . in connection with Article III standing issues." *Levine v. Vilsack*, 587 F.3d 986, 996–997 (9th Cir. 2009) (emphasis added). That is how the Federal Rules of Civil Procedure work. "[T]he plaintiff is the master of a complaint for jurisdictional purposes." *Hawaii ex rel. Louie v. HSBC Bank Nev., N.A.*, 761 F.3d 1027, 1040 (9th Cir. 2014).

There is nothing "inconsistent" or unfair about crediting Cedar Park's allegations, as Washington claims. Appellees Br. 13. The state has ample opportunity to present evidence at later stages, *after* Cedar Park obtains discovery to further support its claims. Because the plaintiff's burden of proof increases at every stage, *Lujan v. Defenders of*

28

*Wildlife*, 504 U.S. 555, 561 (1992), "the evidence necessary to support standing may increase as the litigation progresses," *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 899 (9th Cir. 2011). Introducing extrinsic evidence at the motion-to-dismiss stage is not allowed.

Washington officials argue that Rule 12(b)(1)'s limited exception for "factual attacks" on jurisdiction applies. Appellees Br. 24–25. They are wrong. First, the state launches no factual attack on the supplemental complaint's allegations, let alone on facts that are material to Cedar Park's standing. Washington agrees with the church that "the parties did not dispute the facts." Appellees Br. 13. Without a factual *dispute*, there can be no factual *attack* on Cedar Park's standing.

Second, Washington argues that no factual dispute is necessary. Appellees Br. 24. Yet this Court's precedent uniformly rejects that assertion. The definition of a factual attack is when "the challenger *disputes the truth* of . . . allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (emphasis added); *accord Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016); *Wood v. City of San*

*Diego*, 678 F.3d 1075, 1083 n.8 (9th Cir. 2012). If there is no factual dispute, there is no factual attack under Rule 12(b)(1).

Third, Washington's theory rests on a case in which this Court held plaintiffs had *standing* at the outset but that later government conduct rendered their request for prospective relief *moot*. Appellees Br. 23–24. No one argues that Cedar Park's case is moot, so *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000), is beside the point. What's more, the *White* defendants *disputed* the plaintiffs' factual allegations, the very thing Washington argues is not required.

*White* involved allegations by Berkley residents that HUD officials were engaged in "continued efforts . . . to pursue and regulate protected speech" in a manner that previously injured them and was likely to do so again. *Id.* at 1242. These allegations were "sufficient to give the plaintiffs standing." *Id.* But HUD officials presented *conflicting* evidence under Rule 12(b)(1) showing "a permanent change in the way HUD conducts . . . investigations" that was "fully supportive of First Amendment rights." *Id.* at 1243. Because *conflicting* evidence showed the officials' "challenged conduct [was not likely] to recur," this Court held "the plaintiffs' claim for prospective relief . . . moot." *Id.* at 1244.

30

In short, *White* provides no support for Washington's argument. By definition, "[a] factual attack contests the truth of the [plaintiff's] allegations." *Harris v. KM Indus., Inc.*, 980 F.3d 694, 699 (9th Cir. 2020) (cleaned up). Because the state does not dispute any facts that Cedar Park alleged, the district court plainly erred in considering extrinsic evidence and dismissing the supplemental complaint.

Finally, Washington officials proffered faulty extrinsic evidence to obtain dismissal below. As Cedar Park explained at length in its opening brief, the church is *not eligible* for a Providence group health-insurance plan that might exclude abortion coverage. Opening Br. 52–56. That is because Providence does not even offer such a plan where Cedar Park is located. *Id.* at 54–55.

## VI. Washington's request for a 12(b)(6) dismissal on the merits is improper and meritless.

Trying to save the district court's dismissal ruling, Washington now argues that Cedar Park's complaint fails to state a claim on the merits. Appellees Br. 16–17, 35–49. But precedent bars transforming the district court's 12(b)(1) dismissal on standing grounds—based on its improper consideration and misreading of extrinsic evidence—into a 12(b)(6) dismissal on the merits. Opening Br. 50–52.

31

Even if this Court reaches the merits, Cedar Park's First and Fourteenth Amendment claims rest on established legal theories, and the complaint alleges facts that render those claims plausible. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015); 2-ER-227–29 (incorporating 2-ER-182–203). Accepting Cedar Park's allegations as true and construing them in the church's favor leads to the "reasonable inference" that Washington "is liable for the misconduct alleged." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 496 (9th Cir. 2019) (cleaned up).

Washington contends that "health insurance requirements are not part of ecclesiastical decisions" and do not implicate churches' religious autonomy. Appellees Br. 16; *accord id.* at 48–49. But the federal government exempts houses of worship from the ACA's contraceptive mandate for a reason. *Hobby Lobby*, 573 U.S. at 698. Churches have a "special status under longstanding tradition in our society and under federal law." *Pennsylvania v. President United States*, 930 F.3d 543, 556–57 (3d Cir. 2019), *rev'd on other grounds by Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020).

32

The First Amendment "dictates [an] exemption for houses of worship" from abortion-coverage requirements. *Id.* at 570 n.26.

The state essentially admitted as much elsewhere. Washington told the Supreme Court that abortifacient-contraceptive mandates "raises distinct legal issues" as far as "houses of worship" are concerned. Combined Br. in Opp'n at 20 n.7, *Dep't of Health & Human Servs. v. California*, Nos. 19-1038, 19-1040, 19-1053 (U.S. March 20, 2020), https://bit.ly/3nftjgE. The state contradicts itself now. But requiring churches to cover abortion in their health plans is one of those instances in which "the burden on religious liberty is simply too great to be permissible."[5] *Werft v. Desert Sw. Annual Conf. of the United Methodist Church*, 377 F.3d 1099, 1102 (9th Cir. 2004).

Washington officials hide behind a veneer of neutrality and general applicability. Appellees Br. 35–46. Yet they misunderstand both. The Free Exercise Clause protects against "subtle . . . suppression of religion or religious conduct," as well as "facial" attacks. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533

---

[5] Generally applicable laws are subject to the religious-autonomy doctrine. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012). *But see* Appellees Br. 48.

(1993). No proof of animus is required to state a free-exercise claim. *Cent. Rabbinical Congress of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 197 (2d Cir. 2014); *Shrum v. City of Coweta*, 449 F.3d 1132, 1144–45 (10th Cir. 2006). So Washington's argument that its intentions are pure is beside the point, Appellees Br. 37–40, as the Supreme Court recently made plain.[6] *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66–67 (2020).

Courts infer that laws like SB 6219 which "visit[] gratuitous restrictions on [churches'] religious conduct seek[] not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Lukumi*, 508 U.S. at 538 (cleaned up). SB 6219's main effect "in its real operation" is to strip away abortion-excluding plans from religious objectors and that effect "is strong evidence of its object." *Id.* at 535. Because SB 6219 "suppress[es] much more religious conduct than is necessary," the law is "not neutral." *Id.* at 542.

---

[6] *See also Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232 (9th Cir. 2020) (*Cuomo* is arguably a "seismic shift in Free Exercise law").

The "categories of selection" Washington employs also violate the First Amendment. *Id.* at 542. Government cannot "discriminate *among* religions," especially when it comes to highly politicized matters like "birth control and abortion laws." *Larson v. Valente*, 456 U.S. 228, 252 (1982). Yet SB 6219 imposes an abortion-coverage requirement "on some religious organizations but not on others." *Id.* at 253.

SB 6219 does not "operate evenhandedly, nor was it designed to do so," rather it "effects the *selective* legislative imposition of burdens and advantages upon particular" religious groups. *Id.* at 253–54. Health care providers, religiously-sponsored health carriers, and health care facilities are exempt from the mandate, while houses of worship are not. That "religious gerrymander[ ]" violates the Religion Clauses.[7] *Id.* at 255; *Lukumi*, 508 U.S. at 534.

Washington's equal-protection violation is "parallel" to its Establishment Clause breach. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1257 (10th Cir. 2008). "The 'intent to discriminate' forbidden under the Equal Protection Clause is merely the intent to treat

---

[7] *Accord Cuomo*, 141 S. Ct. at 73 (Kavanaugh, J., concurring) ("[O]nce a State creates a favored class of [organizations], . . . the State must justify why houses of worship are excluded from that favored class.").

differently." *Id.* at 1260. Strict scrutiny applies when a state "classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as . . . religion." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). "The First Amendment must apply to all citizens alike . . . ." *Lyng*, 485 U.S. at 452. Yet Washington respects religious freedom selectively.

Washington's only excuse for this disparity is that churches are not similarly situated to health care providers, religiously-sponsored health carriers, and health care facilities. Appellees Br. 29–32. Yet those entities all share the same religious objection to abortion coverage, *cf.*, *Hobby Lobby*, 573 U.S. at 723 n.33, and the government may not "discriminate between 'types of [religious] institution[]' on the basis of the nature of [their] religious practice" or ministry, *Colo. Christian Univ.*, 534 F.3d at 1259. What's more, Cedar Park makes a direct apples-to-apples comparison: religious health care entities may exclude abortion coverage from their own employees' health plans but houses of worship may not. 2-ER-228 (incorporating 2-ER-190–91).

Because Cedar Park's constitutional claims are entirely plausible, there is no justification for dismissing the supplemental complaint.

## CONCLUSION

Nothing in the Washington officials' brief explains away the district court's error. This Court should reverse the district court's 12(b)(1) dismissal order and remand for proceedings on the merits.

Date: January 26, 2021        Respectfully submitted,

                                */s/ John J. Bursch*

DAVID A. CORTMAN          KRISTEN K. WAGGONER
RORY T. GRAY                JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM   ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd, NE    440 First Street, NW
Suite D-1100                Suite 600
Lawrenceville, GA 30043      Washington, DC 20001
(770) 339-0774              (202) 393-8690
dcortman@ADFlegal.org       kwaggoner@ADFlegal.org
rgray@ADFlegal.org           jbursch@ADFlegal.org

                                  KEVIN H. THERIOT
                                  ELISSA M. GRAVES
                                  ALLIANCE DEFENDING FREEDOM
                                  15100 N. 90th Street
                                  Scottsdale, AZ 85260
                                  (480) 444-0020
                                  ktheriot@ADFlegal.org
                                  egraves@ADFlegal.org

        *Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-35507

I am the attorney or self-represented party.

**This brief contains** | 6,969 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated | |.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ John J. Bursch | **Date** | January 26, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate CM/ECF system on January 26, 2021.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

*/s/ John J. Bursch*
John J. Bursch